## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Maureen Dempsey, Heinz E. Schlenkermann, and Chris Shelton, individually, and as representatives of plan participants and plan beneficiaries of the Verizon Management Pension Plan and the Verizon Pension Plan for Associates,<br><br>      Plaintiffs,<br><br>          v.<br><br>Verizon Communications Inc.; Verizon Employee Benefits Committee, as Plan Administrator; Verizon California Inc., as Plan Sponsor of the Verizon Pension Plan for Associates; Verizon Corporate Services Group Inc., as Plan Sponsor of the Verizon Management Pension Plan, and State Street Global Advisors Trust Co.<br><br>      Defendants. | Case No.   1:24-cv-10004 |

## CLASS ACTION COMPLAINT

Plaintiffs Maureen Dempsey, Heinz E. Schlenkermann, and Chris Shelton, individually and as representatives on behalf of a class of similarly situated persons, by and through their counsel, bring this Complaint for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs complain and allege as follows:

## NATURE OF THE CASE

1.     This case concerns 56,000 Verizon Communications Inc. ("Verizon") retirees who formerly participated in one of two defined benefit pension plans, the Verizon Management Pension Plan and the Verizon Pension Plan for Associates (hereinafter the "Plans"), sponsored by Verizon affiliates and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

1

2.     On March 6, 2024, Verizon entered into two group annuity contracts involving $5.7 billion in plan assets with the Prudential Insurance Company of America ("PICA") and RGA Reinsurance Company ("RGA") that resulted in all 56,000 of these retirees losing all of the uniform protections intended by Congress under ERISA, including the Federal backstop provided to all ERISA protected plans by the Pension Benefit Guaranty Corporation ("PBGC").

3.     The combination of unique risks posed by the Verizon/PICA/RGA transaction is contrary to the best interests of the impacted Verizon retirees, and has resulted in less secure pension benefits for those retirees.

4.     As such, these transactions were imprudent, disloyal and otherwise prohibited by ERISA. The Verizon retirees have now been transformed into certificate holders under risky group annuities that are no longer regulated by ERISA or insured by the Pension Benefit Guaranty Corporation ("PBGC"). As a consequence, impacted retirees are quite rightly fearful and concerned about their futures, the fate of their retirements, and the financial well-being of their beneficiaries.

5.     ERISA imposes strict fiduciary duties on plan sponsors and their independent fiduciaries when they offload company pension obligations to insurance companies through the purchase of annuities.

6.     In this case the independent fiduciary was State Street Global Advisors Trust Co. ("State Street"), which touts its knowledge and experience in helping companies eliminate their pension risks, and is, in fact, a frequent participant in annuitization transactions for pension plans.

7.     However, as described in detail below, State Street was anything but independent. In fact, State Street directly profited from the annuitization transactions through its common stock holdings in Verizon, Prudential Financial, Inc. ("PRU") PICA's direct parent and RGA. State

Street failed to act solely in the interests of the Plan Participants as required under ERISA. Rather, State Street's own financial interests were improperly served by off-loading Verizon liabilities to PICA and RGA, and by helping Verizon obtain the cheapest available annuity provider, as opposed to the "safest available" annuity provider as required by ERISA. 29 C.F.R. § 2509.95-1. Simply stated, State Street put its own financial interests in front of the interests of plan participants turning the very notion of an "independent fiduciary" on its head in violation of ERISA.

8.      Instead of going through a rigorous, independent and thorough selection process that took into consideration the requisite analysis that an ordinary and prudent ERISA fiduciary is required to undertake, Verizon and State Street chose to purchase substandard annuities for Verizon retirees from PICA and RGA, which are both heavily dependent upon transactions with affiliates that are not transparent and expose plan participants to unreasonable amounts of risk and uncertainty. These affiliates are domiciled in "regulation light" jurisdictions where wholly owned captive reinsurers and affiliates are permitted to count debt instruments as assets and are not required to file publicly available financial statements in accordance with Statutory Accounting Principles ("SAP"), the requisite accounting standard under which all U.S. life insurance companies operate. Without clarity around the assets, liabilities, structure and claims paying ability of these wholly owned captive reinsurance companies and affiliates, State Street and Verizon could not possibly have met their obligations as prudent fiduciaries under ERISA.

9.      Plaintiffs maintain that State Street and Verizon ignored obvious red flags with respect to the scope and magnitude of PICA and RGA's reliance upon affiliates within the same controlled group. In so doing, Defendants failed to conduct a reasonably thorough and complete analysis of PICA and RGA's exposure to captive and affiliated reinsurers and the specific risks and liquidity implications for off-loaded plan participants. Had either Defendant done such an

analysis, they could not reasonably have selected PICA and RGA as suitable stewards for Plan participants' pensions.

10.    Information about PICA's and RGA's exposure to affiliates can be readily obtained from their quarterly and annual statutory financial statements that are filed in all U.S, jurisdictions where PICA and RGA transact business. At a minimum, Verizon and State Street should have requested copies of statutory financial statements that clearly detail affiliated party reinsurance and exposure to risky assets, including assets originated by affiliates. Statutory financial statements must be signed by top executives under penalty of perjury. Had they done so, they would have realized that purchasing PICA and RGA issued group annuities for Plan participants was imprudent. If they did so, and chose these providers anyway, they did so based on the cost savings and other financial benefits these providers offered to Verizon out of self interest, a course of action wholly inconsistent with the duties of loyalty that Verizon and State Street owed to the Plan participant retirees under ERISA.

## JURISDICTION AND VENUE

11.    The Court has federal subject matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiffs' claims for relief arise under ERISA. 29 U.S.C. §§ 1001, *et seq.*

12.    Venue of this action lies in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2), in that Defendant Verizon maintains its principal executive offices in this District and Defendant State Street has substantial business operations in the Southern District of New York. In addition, the alleged breaches occurred in this district because many class members earned their pension benefits while working for Verizon in the Southern District of New York and the Southern District of New York is a convenient forum for all parties to resolve this dispute.

**THE PARTIES**

13.    Named Plaintiff Maureen Dempsey ("Dempsey") is a resident of Brooklyn, New York. She is a "participant," as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the VERIZON PENSION PLAN FOR ASSOCIATES whose retirement benefits were annuitized in the transactions at issue in this case.

14.    Ms. Dempsey began working for NY Telephone Company (a predecessor of Verizon Communications Inc.) during her summers in high school and college as an office clerk performing various duties such as data entry and data monitoring. She graduated from college in May 1984, and began working full-time for the NY Telephone Company three months later. She started in a management role as an engineer and was eventually promoted to Engineering Manager. She spent eight (8) years in the Engineering Department working with Central Office personnel, as well as vendors, to implement equipment additions to the network. Ms. Dempsey then left the company for a few years, before returning to Bell Atlantic (another predecessor of Verizon Communications Inc.) in 1999 as a Central Office Technician (COT).   Her duties as a COT included interfacing with customers, testing circuits, isolating troubles and initiating actions to repair such troubles. She was upgraded to Telecommunications Technical Associate (TTA) in 2005 following enrollment in an advanced study program sponsored by Verizon. She continued in her role as TTA until her retirement in 2021.

15.    On or about September 11, 2021, Ms. Dempsey retired from Verizon Communications Inc. after 31.5 years of loyal service.

16.    Named Plaintiff Heinz E. Schlenkermann is a resident of Ossining, New York. He is a "participant," as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the VERIZON MANAGEMENT PENSION PLAN whose retirement benefits were annuitized in the transactions

at issue in this case.

17.     Mr. Schlenkermann started his career as a Switchman and was eventually promoted to Foreman in inside switching offices in the Bronx and Manhattan. Later in his career he was transferred to a facility in Westchester, New York where he was responsible for all building operations. He retired in May of 1994 though he continued to do contract work for Verizon for several years after retirement. Mr. Schlenkermann is concerned about PICA taking over the sickness and death benefit his spouse is due to receive upon his death and he is particularly concerned about the fine print contained in documents he received from Prudential that state the following:   "Pension and medical risk transfer products are insurance products issued by the Prudential Insurance Company of America (PICA), Newark, NJ, a wholly owned subsidiary of Prudential Financial Inc. (PFI). PICA is solely responsible for its financial condition and contractual obligations."

18.     Chris Shelton is a resident of the Bronx, New York. He is a "participant," as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the VERIZON PENSION PLAN FOR ASSOCIATES whose retirement benefits were annuitized in the transactions at issue in this case. Mr. Shelton began receiving his Verizon pension in 1998.

19.     Mr. Shelton began working for the NY Telephone Company (a predecessor of Verizon) as an outside technician in 1969 and joined Local 1101 of the Communications Works of America ("CWA") on his first day on the job. In 1975 Mr. Shelton performed full-time work for CWA Local 1101 while remaining an employee with Verizon. He retired from Verizon in 1998 but continued his work with the CWA. In 1999 he was appointed as the CWA Area Director for the New York and Connecticut areas and worked his way through increasingly senior union leadership positions until he was elected as the Vice President of CWA in 2005 and President of

CWA International in 2015. He retired in 2023 with more than 50 years of experience representing employees of Verizon and various other corporate entities as both Vice President and President of the CWA.

20. Defendant VERIZON COMMUNICATIONS INC. is a Delaware corporation with operations and its principal executive offices located at 1095 Avenue of the Americas, New York, New York. It is a plan fiduciary because of its role in overseeing and appointing the other fiduciaries for the Plan. With respect to the transactions at issue, it acted as a fiduciary because it entered into contracts with State Street to act as the independent fiduciaries for these transactions and with PICA and RGA to purchase the group annuities.

21. The VERIZON EMPLOYEE BENEFIT COMMITTEE ("VEBC" or the "Committee") is listed as the Plan administrator in Form 5500 filings with the Department of Labor for both Plans. As such, it is a named fiduciary, and it is responsible for the general administration of the Plans.

22. VERIZON CALIFORNIA INC., c/o registered agent CT Corporation System, 28 Liberty Street, New York, NY is the plan sponsor of the Verizon Pension Plan for Associates.

23. VERIZON CORPORATE SERVICES GROUP INC., c/o registered agent CT Corporation System, 28 Liberty Street, New York, NY, is the plan sponsor of the Verizon Management Pension Plan.

24. STATE STREET GLOBAL ADVISORS TRUST CO. is a for-profit corporation with its principal place of business located at 1 Iron Street, Boston, Massachusetts 02210-1641. State Street acted as the independent fiduciary with respect to the PICA and RGA annuity transactions and as such is a fiduciary with respect to its role.

## FACTS

### *Background on the Transfer of Pension Benefit Responsibilities to Insurance Companies*

25.    In a defined benefit pension plan, the plan sponsor (typically the employer) agrees to pay monthly pension benefits to retirees as they come due for the rest of the participants' lives, and it funds those benefits through assets contributed both initially and over time by the employer that are invested and held in trust for plan participants.

26.    The employer must pay the pension benefits, even if investment performance falls short of expectations.

27.    The employer must also make additional contributions to the Plan in accordance with ERISA's funding requirements, which demand additional plan contributions in certain circumstances, including if investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants. Thus, the investment risk—the possibility that the plan's investments will generate insufficient returns to cover the plan's pension obligations and the expenses of operating the plan—is borne entirely by the plan sponsor.

28.    If the sponsor goes bankrupt or otherwise lacks the resources to continue to fund the Plan and pay required benefits, the PBGC – a wholly owned U.S. Corporation that administers an insurance program funded through annual premiums paid by all defined benefit pension plans or their sponsors – steps in as a backstop to pay benefits due.

29.    These features of defined benefit plans make them both valuable and predictable for retirees. Such plans once dominated the American retirement system because they were correctly seen as a way to attract and retain the best workforce.

30.    But because these plans are so valuable to employees, they are conversely expensive for employers. Consequently, as part of a recent trend by employers that sponsor defined

benefit plans to improve their bottom lines, numerous sponsors have chosen to shift their liability for monthly pension payments to some or all of the plan participants, to an insurance company through the purchase of group annuity contracts.

31.     The upside of such transactions — enjoyed by plan sponsors — is increased profits; the downside — borne by plan participants — is the increased risk of losing promised retirement benefits because, if the annuity provider is unable to perform, the benefits are no longer guaranteed by their former employer and the PBGC.

32.     Although these transactions are now a common way for employers to diminish their defined benefit liabilities (and to profit from such transactions) or to dispense with defined benefit plans altogether, they are not new.

33.     In the 1980s, hundreds of employers terminated their well-funded, federally insured defined benefit pension plans and bought retirement annuities from a variety of insurance companies, including Executive Life Insurance Company ("Executive Life"), which was then one of the country's largest insurers, but which had embarked on a disastrous "junk bond" investment strategy.

34.     The pension benefits of approximately 84,000 workers and retirees were transferred from the federally regulated pension system to Executive Life.

35.     Executive Life was often selected by employers because it offered the lowest bid on group annuity contracts. Rather than choose a safer, more expensive annuity, employers placed their own financial interests over plan participants' needs.

36.     Those decisions proved disastrous when, in 1991, Executive Life became insolvent. A significant portion of its assets had been invested in high-risk, high-yield bonds

procured through the Drexel Burnham Lambert ("Drexel") investment bank, which then failed due to its risky bond strategy.

37.    The failure of Drexel led to Executive Life defaulting on its annuity contracts, thereby failing to make good on its obligations to tens of thousands of pension annuitants. State regulators were required to seize the company in April 1991 to prevent a run. The debacle resulted in massive losses to pensioners and total losses to policy holders were estimated in the billions of dollars.

38.    Members of Congress were outraged by Executive Life's implosion and its impact on retirees. In response, they enacted the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401 (Oct. 22, 1993) ("PAPA"), as an amendment to ERISA in order to prevent similar crises and ensure that plan participants would have legal recourse against risky pension transfers by plan fiduciaries. Through this amendment, ERISA now provides expressly that plan participants and beneficiaries ejected from the federal pension regulatory system by a plan sponsor's purchase of annuities may sue for relief to, *inter alia*, assure the receipt of the benefits to which they are entitled. 29 U.S.C. § 1132(a)(9).

39.    And in 1995, the Department of Labor promulgated Interpretive Bulletin 95-1, 29 C.F.R. § 2509.95-1 ("IB 95-1"), which — like PAPA — aimed to prevent the irresponsible transfer of pension liabilities to insurance companies that are not sufficiently secure to guarantee retirement benefits, a principal animating force behind the enactment of PAPA and indeed ERISA itself. IB 95-1 has since been updated, consistent with that purpose.

40.    IB 95-1 provides courts, regulated entities, and the public with the Department of Labor's expert guidance on the fiduciary standards that apply under ERISA to the selection of

an annuity provider when a fiduciary transfers defined benefit pension liabilities to an annuity provider. *See* IB 95-1(a).

41.     It explains that selecting an annuity provider is a fiduciary decision under ERISA, 29 U.S.C. § 1104(a), and that employers therefore must act solely in the interest of the plan's participants and beneficiaries and in accordance with ERISA's strict prudence standard when selecting an annuity provider. IB 95-1(b) (citing 29 U.S.C. § 1104(a)).

42.     Thus, to meet their loyalty and prudence obligations in selecting an annuity provider, fiduciaries must "take steps calculated to obtain the safest annuity available, unless the interests of the participants and beneficiaries demand otherwise." Fiduciaries must also, at a minimum, "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities." IB 95-1(c).

43.     In performing that analysis, plan fiduciaries must consider, among other things:

(i)     the quality and diversification of the annuity provider's investment portfolio;

(ii)    the size of the insurer relative to the proposed contract;

(iii)   the level of the insurer's capital and surplus;

(iv)    the lines of business of the annuity provider and other indications of an insurer's exposure to liability;

(v)     the structure of the annuity provider and other indications of an insurer's exposure to liability;

(vi)    the availability of additional protection through state guaranty associations and the extent of their guarantees.

### *The Annuity Transactions at Issue*

44.     On February 29, 2024, Verizon reported as follows in a Form 8-K[1]  filed with the

United States Securities and Exchange Commission ("SEC"):

**Item 7.01. Regulation FD Disclosure**

On February 29, 2024, Verizon Communications Inc. ("Verizon") entered into two separate commitment agreements, one by and between Verizon, State Street Global Advisors Trust Company ("State Street"), as independent fiduciary of the Verizon Management Pension Plan and Verizon Pension Plan for Associates (the "Pension Plans"), and The Prudential Insurance Company of America ("Prudential"), and one by and between Verizon, State Street and RGA Reinsurance Company ("RGA"), under which the Pension Plans purchased a nonparticipating single premium group annuity contract from Prudential and a nonparticipating single premium group annuity contract from RGA to settle approximately $5.9 billion of benefit liabilities of the Pension Plans.

The purchase of the group annuity contracts closed on March 6, 2024. The group annuity contracts primarily cover a population that includes 56,000 retirees who commenced benefit payments from the Pension Plans prior to January 1, 2023 ("Transferred Participants"). Prudential and RGA each irrevocably guarantee and assume the sole obligation to make future payments to the Transferred Participants as provided under their respective group annuity contracts, with direct payments beginning July 1, 2024. Prudential and RGA will each assume 50% of the benefit obligation related to Transferred Participants, except in certain jurisdictions where Prudential will assume 100% of the benefit obligation related to Transferred Participants residing in such jurisdictions. The aggregate amount of each Transferred Participant's payment under the group annuity contracts will be equal to the amount of each individual's payment under the Pension Plans.

Participants in the Pension Plans who are not covered by the group annuity contracts, including management and associate retirees who commenced benefit payments on or after January 1, 2023 and active and term vested managers and associates, will not be affected by this transaction.

Transferred Participants will continue to receive their benefits from the Pension Plans until July 1, 2024, at which time Prudential will assume responsibility for administrative services, including distribution of payments to the Transferred Participants, on behalf of itself and, where applicable, RGA.

The purchase of the group annuity contracts was funded directly by assets of the Pension Plans. Verizon made additional contributions to the Pension Plans prior to the closing date of the transaction in the aggregate amount of approximately $365 million. With these contributions, the funded ratio of each of the Pension Plans does not change as a result of this transaction.

As a result of the transaction, Verizon expects to recognize a one-time non-cash pension settlement credit in the first quarter of 2024.   The actual amount of the credit will depend on finalization of the actuarial and other assumptions.

45.     As a result of the transactions with PICA and RGA, 56,000 retirees will not receive

pension benefits promised by Verizon. Instead, either PICA or RGA are now responsible for these

pension benefits, including payment of the Pensioner Sickness and Death Benefit that was also

off-loaded to PICA and RGA without providing retirees with any information whatsoever about

---

[1]  *See* http://pdf.secdatabase.com/310/0000732712-24-000015.pdf (last retrieved on December 27, 2024).

how this Pensioner Death Benefit was valued, what retirees are impacted and why and without informing any impacted spouses or beneficiaries whatsoever about how and where to file claims in the event of a death of an existing Pensioner.

46.     The Verizon/PICA/RGA transactions were neither prudent nor loyal and, as such, they undermine the protective scheme set up by Congress in ERISA. These transactions eliminated Verizon's obligations to pay many millions of dollars in annual premiums to the PBGC and placed the retirees in an inferior and non-uniform state regulated regime that only offers minimal protections through state guaranty associations, which apply based on the state in which the annuitants reside. These state guaranty associations do not provide retirees with nearly as much uniform protection in the event of insolvency by PICA or RCA as does the PBGC under the federal ERISA-governed system. and most of them are not pre-funded and can only seek contributions from insurers in their state based on the amount of premium written in any given year.[2]  Prior to March 6, 2024, Plaintiffs and all putative class members had Plan benefits that were insured or guaranteed by the federal PBGC at age 65 up to the annual limit of approximately $85,295.40 for a single life annuity (for the participant alone) and $76,765.92 for a joint and 50% survivor annuity (which continues to provide benefits to surviving spouses for their lifetimes). These limits are per year, per retiree and that annual protection is for an *unlimited* number of consecutive years.[3]  For a plan participant age 75, that coverage amount increases to $259,298.04 per year for a straight life annuity and $233,368.20 for joint and 50% survivor annuity as the protected annual PBGC

---

[2]  *See, e.g.*,  https://www.dfs.ny.gov/consumers/life_insurance/policyholder_protection_and_the_licgc  (last retrieved on December 27, 2024) ("The [New York] Guaranty Fund is funded through assessments against member insurers made after a member insurer is declared insolvent by a court of law. These funds are used to pay valid claims, as well as administrative expenses.").

[3]  See https://www.pbgc.gov/wr/benefits/guaranteed-benefits/maximum-guarantee, last retrieved on December 27, 2024.

benefit limit is much higher for older retirees and PBGC benefits increase as a function of age, unlike state guaranty association coverage limits which are per individual, per lifetime and wholly unsuitable for annuities that are generally paid out monthly over many years. Once Plaintiffs and potential class members were removed from the Plan and transferred by Verizon to PICA and RGA, they lost all federal PBGC protections which were replaced by the insufficient and varying state guaranty coverage amounts determined by the retirees' state of residence at the time of the insurance company insolvency or impairment. The amount of state guaranty coverage ranges from $250,000 to $500,000 per individual, per lifetime depending upon the state of residency of the retiree at the time of insolvency.

47.     Even aside from lifetime limits, retirees located in California lose 20% of the present value of their coverage amount immediately following any declaration of insolvency or impairment. Cal. Ins. Code § 1067.02.

48.     Moreover, the ability of any of these state guaranty associations to withstand an insurance company insolvency of a company the size of PICA is entirely untested and uncertain.

49.     Retirees and their spouses and beneficiaries, especially those residing in states with the lowest protection levels, were immediately harmed by receiving unsafe and inappropriate annuities that were worth far less than available annuities that are safe and appropriate. Indeed, some would be left with less than two years of pension replacement coverage in the event of a liquidation of PICA or RGA. And this harm is not theoretical given the risky nature of PICA and RGA, which, as discussed next, are both under-reserved and invested in risky assets that hide their true financial condition.

50.     Moreover, inferior coverage limits in the event of an insurance company insolvency create immediate, genuine and substantial economic harm for retirees. It influences retirees'

quality of life, the ability to relocate to be closer to family members in other states, investment decisions involving other assets, and retiree healthcare choices and treatment.   All of these lost benefits can be readily ascertained and quantified by experts.

51.     As a result of the Verizon/PICA/RGA transaction, Plaintiffs and all other impacted retirees lost all of their ERISA protected rights, including mandated annual financial disclosures, the ability to sue in federal court under a protective federal scheme that imposes exacting fiduciary duties on the company and others who manage the Plan and its assets and a claims procedure that must be "full and fair." PICA and RGA are <u>not</u> required to disclose to any transferred retiree how his or her annuity funding is invested and who is in charge of the underlying investments.   Nor is PICA or RGA required to explain the impact of all of the affiliated party transactions on PICA's or RGA's reserves. On the contrary, PICA's and RGA's reinsurance transactions with their captive and offshore affiliates are all secret.

52.     The Verizon/PICA/RGA transaction is not what the Plaintiffs and the potential class of management and union retirees bargained for when they loyally served Verizon and predecessor companies, including those comprising the old Bell System. The involuntary removal of Plaintiffs and the putative class of retirees from the Plan and transfer to PICA/RGA is not in Plaintiffs' and putative class members' best interests because the group annuity contracts were far from the safest available annuities and were therefore imprudent, as discussed next.

### *Verizon's and State Street's Choice of PICA and RGA for the Annuity Transactions was Imprudent*

53.     Even a cursory review of PICA's statutory filings reveals a shocking dependence on affiliated party transactions with wholly owned affiliates and captive reinsurers and affiliates in Bermuda. In Schedule S - Part 3 - Section 1 of PICA's 2023 annual statement, PICA reports all of its ceded reinsurance with affiliates and its opaque Modified Co-insurance ("ModCo")

transactions with affiliates, described in detail herein. As set forth in the chart directly below, PICA reported liabilities offloaded (via reinsurance or ModCo) to wholly owned captives and affiliates in the amount of $72,884,344,104 as of December 31, 2023.

ANNUAL STATEMENT FOR THE YEAR December 31, 2023 OF THE The Prudential Ins Co Am (NAIC #68241)

**SCHEDULE S - PART 3 - SECTION 1**

**Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities**

|  | Reserve Credit Taken | Modified Coinsurance Reserve |
|---|---|---|
| General Account - Authorized - Affiliates US - Captive | 0 | 0 |
| General Account - Authorized - Affiliates US - Other | 59,576,712,067 | 0 |
| General Account - Authorized - Affiliates Non-US - Captive | 0 | 0 |
| General Account - Authorized - Affiliates Non-US - Other | 0 | 0 |
| **General Account - Authorized - Affiliates - Total** | **59,576,712,067** | **0** |
| General Account - Unauthorized - Affiliates US - Captive | 7,498,417 | 0 |
| General Account - Unauthorized - Affiliates US - Other | 0 | 0 |
| General Account - Unauthorized - Affiliates Non-US - Captive | 0 | 0 |
| General Account - Unauthorized - Affiliates Non-US - Other | 2,292,791,790 | 11,007,341,830 |
| **General Account - Unauthorized - Affiliates - Total** | **2,300,290,207** | **11,007,341,830** |
| Total US | 59,584,210,484 | 0 |
| Total Non-US | 2,292,791,790 | 11,007,341,830 |
| **TOTAL** | **$61,877,002,274** | **$11,007,341,830** |
| **TOTAL Res Cr + ModCo:** | **$72,884,344,104** | |

54.     $72.8 billion in affiliated party reinsurance and ModCo is especially shocking when compared to PICA's surplus, which is not only a measure of the risk associated with the annuitized pensions, but surplus is the only buffer protecting policyholders if PICA or RGA become insolvent. As set forth in the chart below, as of December 31, 2023, PICA had a mere surplus of $16 billion. This means that if even a portion of the $72.8 billion in affiliated party reinsurance and ModCo is problematic, PICA will face extreme liquidity and solvency concerns.

**PICA Dec 31, 2023 Sch S, Part 3 - Section 1:**

| Total Surplus | Affil Reins Ceded |
| --- | --- |
| $16,085,373,647 | $72,884,344,104 |



55.     In addition to the credit for reinsurance that PICA has taken through non-arm's-length transactions with affiliates, Schedule S - Part 1 - Section 1 of PICA's own statutory financial statement shows all reinsurance assumed by PICA from its own affiliates. When PICA assumes reinsurance from an affiliate, it agrees to take financial responsibility for certain specified liabilities owed by those affiliates. The chart below was prepared using data from PICA's 2023 Annual Statement, and it lists all reinsurance assumed by PICA from its affiliates including captives, U.S. affiliates, and non-U.S. affiliates as of December 31, 2023.

ANNUAL STATEMENT FOR THE YEAR December 31, 2023 OF THE The Prudential Ins Co Am (NAIC #68241)
**SCHEDULE S - PART 1 - SECTION 1**
**Reinsurance Assumed Life Insurance, Annuities, Deposit Funds and Other Liabilities**

|  | Reserve | Reinsurance Payable on Paid and Unpaid Losses | Modified Coinsurance Reserve |
|---|---|---|---|
| General Account - Affiliates - US - Captive | 3,155,064,916 | 622,762,989 | 0 |
| General Account - Affiliates - US - Other | 470,381,323 | 31,402,000 | 0 |
| General Account - Affiliates - Non-US - Captive | 0 | 0 | 0 |
| General Account - Affiliates - Non-US - Other | 32,759,385,557 | 354,784,712 | 0 |
| **General Account - Affiliates - Total** | **36,384,831,796** | **1,008,949,701** | **0** |
| Separate Accounts - Affiliates - US - Captive | 0 | 0 | 0 |
| Separate Accounts - Affiliates - US - Other | 0 | 0 | 9,353,477,066 |
| Separate Accounts - Affiliates - Non-US - Captive | 0 | 0 | 0 |
| Separate Accounts - Affiliates - Non-US - Other | 0 | 0 | 0 |
| **Separate Accounts - Affiliates - Total** | **0** | **0** | **9,353,477,066** |
| General Account & Separate Accounts - US | 3,625,446,239 | 654,164,989 | 9,353,477,066 |
| General Account & Separate Accounts - Non-US | 32,759,385,557 | 354,784,712 | 0 |
| **TOTAL** | **$36,384,831,796** | **$1,008,949,701** | **$9,353,477,066** |

TOTAL Res + Reins Payable + ModCo:     $46,747,258,563

56.    The bar graph below compares PICA's assumed reinsurance of $46.7 billion, with its surplus of only $16 billion.

**PICA Dec 31, 2023 Sch S, Part 1 - Section 1:**

| Total Surplus | Affil Reins Assumed |
|---|---|
| $16,085,373,647 | $46,747,258,563 |

**PICA 12/31/2023 Affiliated Reins Assumed**

| | Total Surplus | Affil Reins Assumed |
|---|---|---|
| $16,085,373,647 | | |
| | | $46,747,258,563 |

57.    In addition to PICA taking billions of dollars in credit for reinsurance that it ceded to affiliates and in addition to PICA assuming billions in reinsurance obligations from its own affiliates, PICA affiliates, including Pruco Life Insurance Company (AZ) ("Pruco Life") have likewise ceded billions in liabilities to the secret captive reinsurers domiciled in Arizona that are wholly owned by PICA itself. *See* Pruco Life's reported reinsurance ceded totals from their sworn annual statement for year-end 2023, in particular Schedule S - Part 3 - Section 1, highlighted in the chart set forth directly below.

ANNUAL STATEMENT FOR THE YEAR December 31, 2023 OF THE Pruco Life Insurance Co (NAIC #79227)

**SCHEDULE S - PART 3 - SECTION 1**

**Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities**

| | Reserve Credit Taken | Modified Coinsurance Reserve |
|---|---|---|
| General Account - Authorized - Affiliates US - Captive | 45,704,022,380 | 0 |
| General Account - Authorized - Affiliates US - Other | 83,080,596 | 0 |
| General Account - Authorized - Affiliates Non-US - Captive | 0 | 0 |
| General Account - Authorized - Affiliates Non-US - Other | 0 | 0 |
| **General Account - Authorized - Affiliates - Total** | **45,787,102,976** | **0** |
| General Account - Unauthorized - Affiliates US - Captive | 0 | 0 |
| General Account - Unauthorized - Affiliates US - Other | 0 | 0 |
| General Account - Unauthorized - Affiliates Non-US - Captive | 0 | 0 |
| General Account - Unauthorized - Affiliates Non-US - Other | 1,820,590,176 | 12,586,961,064 |
| **General Account - Unauthorized - Affiliates - Total** | **1,820,590,176** | **12,586,961,064** |
| Total US | 45,787,102,976 | 0 |
| Total Non-US | 1,820,590,176 | 12,586,961,064 |
| **TOTAL** | **$47,607,693,152** | **$12,586,961,064** |
| **TOTAL Res Cr + ModCo:** | **$60,194,654,216** | |

58.    While Pruco Life depends upon PICA's wholly owned captives for more than $60 billion in liabilities, Pruco Life's total surplus as of December31,2023 was only $5.16 billion. Said another way, if PICA's wholly owned captives cannot make good on their IOU's to Pruco Life, Pruco Life's surplus will be entirely wiped out.



59.     So, in addition to all of the liabilities ceded to the secret captives by PICA, PruCo Life is also owed more than $60 billion from PICA's wholly owned Arizona captives and affiliates that PICA values at ZERO! This type of financial alchemy and circular non-arm's length reinsurance among affiliates within the same controlled group exposes class members to significant and quantifiable risk of losing their hard-earned pension benefits that far exceeds the risk of loss that they would have if Verizon had purchased group annuities with an appropriate and more transparent insurer.

60.     In addition to the circular movement of liabilities among affiliates, PICA's affiliated captive reinsurers in Arizona all count surplus notes or other debt-like financing instruments as assets, a practice that understates the liabilities of the captives. Yet, as reported in the State of New Jersey Report on Group-Wide Examination of Prudential Financial, Inc., a report filed on June 26, 2023, all seven (7) Arizona captive reinsurance companies owned 100% by PICA (the "Arizona Captives") employ this practice to prop up their financial statements funding "the assets supporting the non-economic reserves it retains with proceeds from the issuance of surplus notes or other financing instruments."

61.     Surplus notes are debt instruments that are subordinated to policyholder claims. Yet, all of the AZ Captives report their surplus notes as "assets," including credit linked surplus notes which are really debt instruments attached to a derivative contract.

62.     PICA's Arizona Captives also count conditional letters of credit and parental guarantees as assets. These conditional instruments could never be reported as "admitted assets" at a regulated U.S. based primary insurance company due to their conditional nature.

63.     The ability of PICA's wholly owned affiliates to make good on their insider reinsurance "IOU's" is entirely speculative and opaque.

64.    Similarly, RGA reported in their 2023 statutory financial statement, specifically in Schedule S – Part 3 – Section 1, that they took over $7 billion in reserve credit for reinsurance with their own Missouri captives and recorded an additional $16.87 billion in reserve credit for reinsurance with other U.S. and offshore affiliates. Furthermore, RGA reported $6.4 billion in ModCo with its offshore affiliates in Bermuda and Barbados. Taken together, RGA has over $30 billion in reserve credit and ModCo with their own onshore and offshore captives and affiliates.

65.    Both PICA and RGA also have excessive exposure to ModCo transactions with those same affiliates and captives. In a typical arm's length reinsurance contract, an insurance company like PICA transfers a portion of its liabilities and some of the associated assets to a reinsurance company. PICA remains liable to its policyholders but can claim against the reinsurer if certain agreed upon triggers are reached. With ModCo on the other hand, an insurance company like PICA keeps both the assets and all of the liabilities associated with certain blocks of business and only transfers risk and regulatory capital requirements to its reinsurer. As a consequence, PICA and RGA, both of which have substantial ModCo exposure to affiliates, hold much less capital in the form of reserves than insurance companies that do not use ModCo -all other things being equal. ModCo also enables the ceding insurer to transfer asset risk to the reinsurer even though the assets themselves are held in a trust account under the control of the ceding insurer. This allows ceding insurers like PICA to artificially inflate their risk-based capital ("RBC") ratios – a metric prescribed by the National Association of Insurance Commissioners ("NAIC") to impose safe capital requirements on all insurance companies in order to avoid regulatory action and protect against insolvency. The RBC system calculates the amount of capital that an insurance company needs to hold to support asset risk, interest rate risk, insurance risk and other risks. Asset risk carries the most weight in the RBC calculation. A high RBC ratio means that an insurance

company is well capitalized; a low RBC ratio can trigger regulatory action. Because of PICA and RGA's ModCo transactions, a significant component of the investment risk associated with risky assets like junk bonds, collateralized debt obligations ("CDOs") collateralized loan obligations ("CLOs"), illiquid private debt or commercial real estate is transferred to their affiliated reinsurers and does not factor into their RBC calculations. As a result, PICA and RGA report higher RBC ratios that they would otherwise be required to report if the risky assets artificially off-loaded via ModCo transactions with their own wholly owned affiliates were included in their RBC calculations.

66.    As noted by the authors of "Regulatory Capital and Asset Risk Transfer, published in the Journal of Risk and Insurance in June, 2023, "modified coinsurance allows insurers to report higher risk-based capital ratios." "ModCo improves the RBC ratio of the ceding insurer because: (i) the ceding commission increases the level of capital, and (ii) the investment risk component of RBC decreases." But the actual financial condition of the insurer has not improved. The authors also compare ModCo to interest rate swaps: "ModCo contracts are similar to interest rate swaps wherein the risk transfers to the counterparty but not the underlying assets and liabilities."[4]

67.    An ERISA fiduciary should know that excessive exposure to ModCo with an affiliate is a red flag that warrants further inquiry. Yet, Defendants chose PICA and RGA even though PICA and RGA have billions in exposure to ModCo transactions with affiliates while companies like New York Life have zero.

---

[4] Kim, Kyeonghee and Leverty, J. Tyler and Schmit, Joan T., Regulatory Capital and Asset Risk Transfer at pp. 3, 12 (June 22, 2023). Journal of Risk and Insurance, http://doi.org/10.1111/jori.12441, Available at SSRN: https://ssrn.com/abstract=4221205 or http://dx.doi.org/10.2139/ssrn.4221205.

68.     To remedy the breach of fiduciary duty that led to the PICA/RGA combo deal, Plaintiffs individually and on behalf of other individuals similarly situated bring this action to obtain relief for Defendants' egregious ERISA violations, including disgorgement of all ill-gotten gains, the posting of appropriate security to backstop the group annuity contracts purchased from PICA and RGA and injunctive relief to prevent Verizon from holding the group annuity contracts outside of the Plans and preventing Verizon from depriving impacted retirees from ERISA's uniform and comprehensive protections.

69.     RGA is a highly unusual choice as an issuer of a group annuity contract and does not enhance retiree security but, to the contrary, puts the retirement income of the annuitants at great risk. RGA is unsuitable for the following reasons: (i) RGA reports more than $30 billion in reinsurance recoverables; (ii) the majority of the affiliated reinsurance payables to RGA are from affiliated reinsurance companies domiciled in Barbados and Bermuda, and a captive reinsurer domiciled in Missouri; (iii) RGA has assumed billions of dollars of reinsurance through more than 1,000 reinsurance agreements from hundreds of life insurers worldwide; and (iv) the majority of the reinsurance risks assumed by RGA have been ceded to their secret captives in Missouri or affiliates offshore.

70.     Over the past decade, PRU has been systematically gutting reserves from its regulated insurance company subsidiaries, primarily PICA, by engaging in sham transactions with wholly owned captive reinsurance affiliates located in Arizona and affiliates offshore in known "secrecy jurisdictions" where financial records are not publicly available, and reserve requirements are lax.

71.     Since 2012 P I C A has done more than $90 billion in PRT transactions in the U.S. PICA has also provided reinsurance to a number of Pension Schemes in the U.K. and  taken

on billions more in longevity exposure in other countries around the world.

72.     While PICA often refers to itself as simply "Prudential", PRU and PICA have very different risk profiles. PRU, PICA's direct parent is a publicly traded financial conglomerate with $1.5 trillion in assets under management as of June 30, 2024 and PRU owns thousands of subsidiaries all over the world, some of which are excellent credit risks. PRU derives substantial revenue from its regulated insurance company subsidiaries that offer individual life insurance and annuity products to consumers across the United States and around the world. PRU is also one of the world's largest providers of pension risk transfer ("PRT") solutions to corporations and defined benefit plan sponsors looking to unload their pension obligations.

73.     However, PRU routinely publishes the following disclaimer in press releases and other publications: "Insurance products are issued by the Prudential Insurance Company of America (PICA), Newark, New Jersey. PICA is a Prudential Financial company. PICA is solely responsible for its financial condition and contractual obligations." Even though Prudential advertises its PRT exposure to the general public as a Prudential exposure: "Prudential and RGA will each irrevocably guarantee and assume 50% of the benefit obligations to the retirees, except in certain jurisdictions where Prudential will irrevocably guarantee and assume 100% of the benefit obligation." It is only at the very end of PRU's PRT press releases where the above-referenced disclaimer appears: "PICA is solely responsible for its financial condition and contractual obligations". PRU would be a more reasonable credit risk for the instant PRT transaction. However, PICA is not even close to suitable for the reasons detailed herein.

74.     While PRU's misleading press releases are not the subject of this Complaint, both Defendants Verizon and State Street know that retirees only have recourse to PICA and RGA and not PRU as set forth in the Group Annuity Contracts. As a result, PRU's financial condition is not

even remotely relevant at all to the obligations of Plan Fiduciaries to analyze the safety and security of the instant PICA/RGA transaction. PRU has no liability whatsoever to Verizon pensioners in the event of a PICA insolvency. That is one of the main reasons why Plan Fiduciaries must thoroughly and completely analyze PICA and RGA's ability, as stand-alone entities to make good on *their* obligations to retirees. Verizon and State Street failed miserably in this regard.

75.    At the same time PICA has been rapidly piling up PRT risk, PICA, has also been s y s t e m a t i c a l l y  circumventing state insurance reserve requirements by abusing wholly owned captive reinsurance companies, primarily in Arizona, and more recently affiliated reinsurers in Bermuda, to "reinsure" blocks of insurance policy claims or other insurance liabilities such as annuity funded pension payments to retirees and other PRT risks. PICA and other PRU affiliates use Arizona and Bermuda as their "regulation light" jurisdictions of choice in order to exploit looser reserve and regulatory requirements and more favorable tax treatment.

76.    Each time a PRU subsidiary enters into a reinsurance transaction with another PRU owned affiliate or captive reinsurer that holds risky debt-like instruments as assets, it effectively lowers reserves that are supposed to be set aside to cover insured liabilities leaving policyholders and pensioners at substantial risk. This type of circular reinsurance with affiliates and/or captives was deemed "financial alchemy" or "shadow insurance" by the New York State Department of Financial Services ("DFS") in June of 2013 when DFS conducted an extensive investigation into these types of practices at New York-based insurance companies and their wholly owned captives and affiliates.

77.    While the DFS investigation did not focus on PRU (domiciled in New Jersey), the Superintendent of Financial Services of the State of New York, Benjamin M. Lawsky, was so shocked by the risks associated with the "financial alchemy" he uncovered that he wrote a

detailed and ominous letter to the Honorable Sherrod Brown, then Ranking Member of the U.S. Senate Committee on Banking, Housing and Urban Affairs, urging Senator Brown to address "a troubling regulatory loophole that threatens the financial stability of the insurance markets, puts everyday policyholders at substantial risk, and provides billions of dollars in unearned tax deductions to large, multi-national corporations. That loophole is life insurance companies' use of 'shadow insurance' vehicles to divert policyholder reserves to other purposes, such as executive compensation, dividends, and acquisitions."[5]

78.    PRU affiliates, primarily PICA, have engaged in the exact same kind of shadow insurance practices and other reserve compromising transactions with affiliates. The mere fact that PRU's secret captives and affiliates hold so many circular debt and debt-like instruments as assets should have raised a red flag for any reasonably prudent fiduciary. The fact that PRU has encouraged and enabled more than $100 billion in affiliated party sham reinsurance transactions with affiliates since 2012 alone should have immediately disqualified PICA from consideration as a sound choice for Verizon pensioners, especially since "PICA is solely responsible for its financial condition and contractual obligations".  Either State Street and Verizon failed to examine the financial statements of the affiliated reinsurers (which would be a blatant breach of their fiduciary duties) or they failed to understand how PICA's exposure to their wholly owned affiliates created risk for the plan participants-whose interests should have been front and center. Both failures put Verizon retirees at substantial risk that could easily have been avoided by following ERISA's

---

[5] *See* Letter dated April 27, 2015, from Benjamin M. Lawsky, Superintendent of Financial Services, State of New York to The Honorable Sherrod Brown, Ranking Member, U.S. Senate Committee on Banking, Housing and Urban Affairs, entered into the record during the Hearing Before the Committee on Banking, Housing, and Urban Affairs on April 28, 2015 at p. 46, https://www.govinfo.gov/content/pkg/CHRG-114shrg97357/pdf/CHRG-114shrg97357.pdf  (last retrieved on December 27, 2024).

mandates.

79.     While the assets held by PICA and RGA's wholly owned captive reinsurers and affiliates may not be readily ascertainable due to the fact that the captives and affiliates are located in secrecy jurisdictions and do not file publicly available financial statements, the amount of credit that PICA and RGA have taken for reinsurance with their wholly owned affiliates is easy to obtain by simply reviewing readily available statutory financial statements as noted above.

80.     When U.S. regulated insurance companies take credit for reinsurance with captives and affiliates that do not report under SAP or make financial statements publicly available it puts retirees at substantial risk. Affiliated party reinsurance transactions are not arm's length as pricing is set within the same group of companies under common control. It amounts to nothing more than a circular movement of assets and liabilities that appears to provide security to policyholders while doing the exact opposite.    Real assets vanish and they are replaced with speculative IOU's.

81.     PICA's excessive interdependence within the PRU holding company system should have been a bright red flag for Verizon and State Street. PICA both cedes liabilities to affiliates and reinsures affiliates, including its own wholly owned Arizona captives as noted below. Another PICA affiliate, PGIM provides investment management services to PICA and PICA affiliates guarantee the obligations of other PICA affiliates in a glaring and circular manner.

82.    Despite Lawsky's ominous warning to Congress, PRU, through PICA dramatically increased its use of shadow insurance after 2015 and PICA's cumulative reserve credit taken for reinsurance with wholly owned affiliates and captive insurance companies domiciled in Arizona far exceeds PICA's surplus. Just the two primary PRU carriers combined went from $19.1 billion in shadow insurance transactions in 2012 to **$133 billion** at year end 2023, as shown on the chart below.



83.    PICA increased its exposure to reinsurance with non-arm's length affiliates and captives in Arizona and Bermuda from $7,794,844,220 in 2012 – when Verizon did its first PRT deal with PICA to **$72,884,344,104** as of year-end 2023 as per the chart below.





84.    PICA was a far more reasonable choice of annuity provider in 2012 when it did the first Verizon transaction involving 41,000 retirees and liabilities then valued by Verizon at $7.5 billion as it had only taken $7.8 billion in credit for reinsurance and ModCo with affiliates as reported on December 31, 2012. Contrast PICA at year end 2012 with PICA at year end 2023 and as depicted in the above chart, PICA's exposure to affiliates jumps tenfold to $72.8 billion as at December 31, 2023.

85.    In addition, while Verizon valued its liabilities at $7.5 billion back in 2012, it paid PICA a total contribution amount as of December 10, 2012 of $8,397,548,847.52 – close to a $1 billion dollar premium over the stated value of Verizon's future liabilities. Ostensibly, the premium paid over the present value of the pension liabilities went to cover costs and PICA's profit for agreeing to take on the liabilities for 41,000 pensioners. On the other hand, with respect to the March 6, 2024 transactions, Verizon reported in its 2024 third quarter 10-Q, "The purchase of the group annuity contracts was funded directly by transferring $5.7 billion of assets of the Pension Plans."[6]  That is $200,000,000 less than the value of Verizon's liabilities. Why did PICA insist on close to a $1 billion dollar premium in 2012 and take $200,000,000 less from Verizon in 2024 to cover pension liabilities? Plaintiffs believe that PICA's offloading of liabilities to wholly owned captives and affiliates and State Street's complicity and conflicts of interest are credible explanations for what appear to be otherwise entirely inconsistent and irreconcilable transactions.

86.    As noted above, PRU would have been a safer choice than PICA for the instant transaction. Ironically, PICA in 2012 would have been a safer and more prudent choice than the PICA of today that is wholly dependent on non-arm's length, contrived transactions with wholly

---

[6] Verizon Communications Inc. (2024). Form 10-Q. U.S. Securities and Exchange Commission. https://www.sec.gov/ix?doc=/Archives/edgar/data/732712/000073271224000069/vz-20240930.htm (last retrieved on December 27, 2024).

owned captives and affiliates that only serve to conceal PICA's true financial condition.

87.     In addition to PICA's own dependence on affiliated captives and affiliated reinsurers, another affiliate, Pruco Life Insurance Company ("Pruco Life"), a wholly owned subsidiary of PICA, increased its affiliated party exposure from $11,328,051,539 in 2012 – when Verizon did the first PRT deal with PICA impacting 41,000 Verizon retirees – to over $60 billion dollars **($60,194,654,216)** as of year-end 2023. *See* the chart below:

**PRUCO LIFE INS CO: AFFILIATED/CAPTIVE/OFFSHORE/MODCO**

COMPARISON OF 12/31/2012 & 12/31/2023



| | 2012 | 2023 |
|---|---|---|
| $ | 11,328,051,539 | $ 60,194,654,216 |



88.    Both PICA and Pruco Life are wholly owned PRU subsidiaries. Combined, PICA and Pruco Life reported reinsurance "IOUs" o r recoverables of **$133 billion** from affiliates/captive reinsurers and those same affiliates/captive reinsurers reported **$133 billion** in reinsurances payables as of year-end 2023. In other words, **$133 billion** of PRU's reinsurance is, if not worthless, circular in nature and internal within the PRU group rather than with arm's length, independent, well capitalized reinsurance companies. *See* the chart below:

ANNUAL STATEMENT FOR THE YEAR 2023 OF THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
## SCHEDULE Y
## PART 2 - SUMMARY OF INSURER'S TRANSACTIONS WITH ANY AFFILIATES

| Names of Insurers, Parent, Subsidiaries, Affil | Reins Recov./(Payable) and/or Reserve Credit Taken (Liability) | Total Captive & Offshore Payables to Affiliates |
|---|---|---|
| Prudential Legacy Insurance Company of New Jers | $ (47,330,009,584) | |
| **Captive**: Prudential Arizona Reinsurance Universal | $ (18,702,977,557) | |
| **Captive**: Prudential Universal Reinsurance Compar | $ (11,289,411,284) | |
| **Captive**: Gibraltar Universal Life Reinsurance Co | $ (4,885,738,352) | |
| **Offshore**: Lotus Reinsurance Company Ltd. | $ (4,429,331,636) | |
| **Captive**: Prudential Term Reinsurance Company | $ (3,838,169,748) | |
| **Captive**: Prudential Arizona Reinsurance Captive C | $ (3,543,086,059) | |
| **Captive**: Prudential Arizona Reinsurance Term Co | $ (3,399,032,599) | |
| **Captive**: Dryden Arizona Reinsurance Term Co | $ (1,543,328,775) | $ (51,638,750,002) |
| **Captive**: Prudential Universal Reinsurance Entity C | $ (7,673,992) | |
| Prudential Seguros Mexico, S.A. de C.V. | $ (2,047,438) | |
| Pruco Life Insurance Company of New Jersey | $ 5,121,823,968 | |
| The Gibraltar Life Insurance Co., Ltd. | $ 7,817,159,971 | |
| The Prudential Life Insurance Company, Ltd. | $ 25,241,215,614 | |
| The Prudential Insurance Company of America | $ 25,263,214,461 | |
| Pruco Life Insurance Company | $ 35,527,393,010 | |
| **TOTAL:** | $0.00 | |

89.    In the snapshot above, a clear pattern emerges. The numbers in red represent amounts owed by the captives and affiliates and the numbers in black are recoverables – or amounts owed by PICA's wholly owned captive reinsurance companies in Arizona and one offshore affiliate, Lotus Reinsurance Company Ltd. located in Bermuda, to PICA and other US based PICA affiliates. Nearly all of the reinsurers with very large amounts due to PRU regulated insurers are the Arizona Captives that do not file public financial statements. Those Arizona Captives owned by PICA owe more than **$47 billion** to PRU affiliates. Such enormous amounts due from secretive "captives" cannot be detected on the balance sheets of the insurers because, rather than report the recoverables as assets, the $47 billion recoverables are netted out of their claims reserve liabilities, booking them as "contra-liabilities." Those amounts are deducted from the claims reserve liabilities *prior* to reporting them on the balance sheet. While the financial statements of the "captives" owing more than **$47 billion** to the regulated PRU insurers are not publicly available, any reasonable independent fiduciary would to inquire into whether or not the Arizona Captives had sufficient assets to make good on **$47 billion** in IOUs to PICA and affiliates. Without definitive proof that the Arizona Captives have the financial ability to make good on more than **$47 billion** in IOU's, the ability of PICA to pay its debts in the ordinary course of business and its obligations to retirees is entirely uncertain. Yet, no information whatsoever about how Verizon and State Street evaluated PICA's financial capabilities has been made available to retirees.

90.    In addition, while all of the Arizona Captives are wholly owned by PICA, PICA values its investment in all of such captives at zero. This is extremely troubling. How can all of the Arizona affiliates with billions in financial obligations to PICA and Pruco Life be fairly valued at zero? If they are, how can PICA be a prudent choice as a annuity provider. *See* below:



91.    Simply stated, if the value of the Arizona Captives is zero, they cannot conceivably have the financial wherewithal to make good on their IOU's, which include tens of billions of dollars in reinsurance payables to PICA.

92.    In addition to the hundreds of billions of liabilities ceded to the Arizona Captives and newly created Bermuda reinsurers, PICA also entered into a significant number of highly opaque ModCo transactions.

93.    PRU affiliates have more than $33 billion in seemingly circular ModCo transactions.    It is circular and highly suspect for PICA to assume $9.4 billion in ModCo from PRUCO Life Insurance Company of New Jersey, its wholly owned subsidiary while also ceding $12.7 billion in ModCo to Pruco Life Insurance Company (AZ), another PICA affiliate located in Arizona.





94.     Similar to the concerns expressed above about the shadow insurance transactions using Arizona Captives, it seems highly unlikely that the affiliate ModCo transactions are legitimate, and they are most certainly not arm's length. At the very least, it seems highly unusual for Prudential to use ModCo for more than $33 billion in related party transactions as these transactions involve little more than a swapping of IOUs for insurance risks that were underwritten and assumed at the regulated insurance company levels.    There is no legitimate reason for swapping so much risk with wholly owned affiliates other than to avoid reporting requirements and artificially enhance risk-based capital ratios. Using and abusing circular ModCo to game RBC levels and thereby reduce minimum required surplus is directly contrary to the intended purpose of establishing minimum capital standards to reduce insolvency risk.

95.     The Arizona Captives that maintain secret financial records are on the hook for a substantial portion of the **$133** billion that they will never be able to pay. More importantly, a significant amount of the **$133** billion that PRU insurers claim to be owed from affiliates and the Arizona Captives has already been up-streamed to PRU  for non-policyholder  purposes, including management fees, investment fees, affiliated reinsurance premiums, and dividends leaving  the  PRU  regulated insurers dramatically under-reserved. In 2023 alone, PRU spent more than $1 billion on stock buy-back transactions.

96.     PICA's captive reinsurance companies in Arizona are allowed to replace real assets with "hollow assets" for reserving purposes including conditional letters of credit, circular parental guarantees, complex surplus notes, including credit linked surplus notes and other collateral of speculative value such as assets identified only as "LOC-like" on statutory financial statements. These type of "hollow assets" are not considered proper assets for an insurance company regulated in New Jersey or in any jurisdiction that adheres to the NAIC Accounting Practices & Procedures

Manual and the NAIC Annual Statement Instructions.

97.    Based on a forensic review of public filings, as of year-end 2023, expert Certified Fraud Examiner Tom Gober was able to identify a staggering number of circular related-party transactions as set forth in the chart below.



98.    Through a detailed review of the entire PRU Holding Company System it becomes clear that there is a dangerous level of interdependence among the myriad affiliates. They reinsure each other, invest in each other, pay dividends to each other, pay management fees to each other and guarantee each other. The interdependence among affiliated entities is glaring, the movement of assets and liabilities circular and the risks far greater to pensioners than what prudence and loyalty permits of Plan fiduciaries such as Verizon and State Street. All of the above information about PICA and its affiliates can be found in publicly available Statutory Financial Statements available from PICA itself and also available by request made to the New Jersey Insurance

Department and the NAIC. Had Verizon and State Street done even a fraction of the analysis that Plaintiffs did before filing the instant action, they could not possibly have reasonably concluded that the PICA/RGA transaction was consistent with their fiduciary duty under ERISA – the highest fiduciary duty in the land. In fact, given the scope and magnitude of PICA's and RGA's suspect transactions with wholly owned captives and affiliates, both on-shore and off-shore, to conclude that PICA and RGA were secure stewards of Plaintiffs' pensions defies all logic and reeks of self-dealing.

99.     Even PICA's reported use of "unaffiliated reinsurers" does not appear to be arms-length. By way of example, in 2023, PICA entered into a new reinsurance transaction of approximately $10 billion ($9.97 billion) with a newly formed offshore reinsurer, Prismic Life Reinsurance, Ltd. of Bermuda ("Prismic"). However, in Schedule S – Part 3, (Reinsurance Ceded) PICA reported Prismic as non-affiliated even though PRU (PICA's ultimate parent) is listed as one of two lead investors in Prismic. Another PRU affiliate, PGIM (PRU's principal asset manager) provides asset management services to Prismic and PRU executives sit on the Prismic board of directors in order to "oversee its long-term strategy." It is simply not reasonable to describe PICA's reinsurance relationship with Prismic as unaffiliated. Yet that is exactly how PICA describes it in public filings.

100.     Related party reinsurance requires mandatory additional regulatory scrutiny and the NAIC Model Holding Company Act, which has been adopted by all fifty states specifically requires that all transactions within an insurance holding company system shall be on terms that are "fair and reasonable." N.J. Stat. § 17:27A-4. In addition, the Model Holding Company Act requires that books and records be so maintained as to clearly and accurately disclose the true nature and details of the transactions in question. Yet PICA reports under SAP and the Arizona

captives and the Bermuda affiliates report under a different accounting regime known as generally accepted accounting principle ("GAAP").   Plaintiffs do not believe that Defendants conducted a thorough and complete inquiry as to the true nature and details of the affiliated party transactions at issue in this case – both with respect to PICA and RGA.

101.    Defendants' failure to reconcile massive, related party transactions that go directly to PICA and RGA's ability to make pension payments to Plaintiffs for decades is at the heart of this case.

102.    Also of note is the fact that Prismic reports under Bermuda GAAP and not SAP like PICA. This reporting discrepancy alone adds to the overall lack of transparency within the complex PRU holding company system. All of this suspect reporting on publicly filed statutory financial statements should have raised red flags for fiduciaries tasked with choosing safe and secure annuity contracts to replace ERISA protected defined benefit plan obligations. How State Street could have ignored all of this publicly reported information and still chosen PICA and RGA as suitable annuity providers for Verizon plan participants defies logic.

103.    PICA also ceded over $2.29 billion to an affiliated Bermuda based reinsurer called Lotus Reinsurance Company Ltd.   ("Lotus"). According to Lotus' own public filings, effective February 1, 2022, Lotus became a wholly owned subsidiary of Prudential International Insurance Holdings, Ltd. ("PIIH"), which in turn is a direct wholly owned subsidiary of PRU. Prior to February 1, 2022, Lotus was wholly owned by PICA. Lotus has extensive related party transactions with PRU, PICA, Prudential International Insurance Service Company, LLC and other PRU affiliates and PGIM provides discretionary investment advisory services to Lotus.

104.    As of year-end 2023 PICA and PRUCO had ceded $4.1 billion in liabilities to Lotus and consummated ModCo transactions totaling $23.6 billion. The structure that PRU uses with its

affiliated Bermuda Reinsurance Companies (Lotus and Prismic) has been described by investigative journalist and Annuity expert Kerry Pechter as the "Bermuda Triangle" phenomenon.

105.    As investigative journalist Kerry Pechter writes in the May 5, 2022, Issue of the Retirement Income Journal ("RIJ"):

> What *RIJ* calls "the Bermuda Triangle" is a synergistic, much-varied business model involving a kind of triple accounting play between:
>
> - A US domiciled life insurer that issues fixed-rate or fixed indexed annuities
> - An asset manager with global reach and expertise in alternative assets and origination of high-yield loans
> - A reinsurer in a jurisdiction (e.g., Bermuda, Cayman Islands, Vermont) that permits the valuation of annuity liabilities according to Generally Accepted Accounting Principles (GAAP) along with or instead of the more conservative Statutory Accounting Principles required of all US life insurers
>
> In the Bermuda Triangle's purest form, all three players belong to the same holding company. They may also have some overlapping ownership, or may be strategic partners. Life insurers who employ all or part of the Bermuda Triangle strategy include leading FA and/or FIA sellers like Athene Annuity & Life, Global Atlantic, AIG, MassMutual, and others. Together, Bermuda Triangle companies accounted for about half of the $116.8 billion in 2021 fixed-rate/fixed indexed annuity sales reported by LIMRA's Secure Retirement Institute."[7]

106.    A detailed review of PICA's public filings and its overwhelming dependence upon affiliates is exactly the type of analysis contemplated by ERISA in order for an independent fiduciary to choose the "safest available annuity" or even a reasonably secure annuity. Verizon and State Street failed miserably in this regard.

107.    Similarly, a detailed review of RGA's exposure to its captive reinsurance affiliate in Missouri and its affiliated reinsurers in Barbados and Bermuda – all of which report under GAAP and not SAP was not something that Plaintiffs believe was undertaken by Defendants in

---

[7]  Pechter, K. (2022, May 5). *Why RIJ Obsesses over the 'Bermuda Triangle'.* Retirement Income Journal. https://retirementincomejournal.com/article/why-rij-obsesses-over-the-bermuda-triangle/ (Last retrieved on December 27, 2024).

this case despite Defendants fiduciary obligation to do just that. Either Defendants failed to properly analyze the risk associated with RGA's exposure to affiliates in regulation light jurisdictions or Defendants simply turned a blind eye to their fiduciary duty to inquire about material and relevant transactions that put plan participants at risk.

108.    Had Defendants considered the quality and diversification of PICA's investment portfolio, they would have known that PICA reported close to $18 billion in investments it lists as "Affiliated Investments" as of year-end 2023 more than 111% of its surplus, PICA has more than $10 billion in investments it simply describes as "Other" Invested Assets, PICA also reported as of year-end 2023 "Other Loan-Backed" investments in the amount of $10,838,636,616 and its exposure to Commercial Mortgages was $16,349,437,360 both as of year-end 2023.

109.    Had Defendants considered the level of PICA's capital and surplus they would have known that PICA's Surplus as a percentage of its liabilities was reported at 5.7% as of year-end 2023 and Pruco Life's was at 3.2% - well below industry averages which approximate 7.5%. But this low surplus is, in fact, substantially inflated because it does not account for the sham reinsurance and abusive ModCo transactions described herein.

110.    By way of comparison, New York Life's ratio of Surplus to Liabilities was 12.2% as of year-end 2023, Teachers Ins. & Ann was at 13.8% as of year-end 2023 and Guardian Life was at 12.7%. Clearly, all of these entities are objectively safer annuity providers than PICA/RGA even if Plan fiduciaries claim to have relied on PICA's stated surplus.

111.    Had Defendants considered PICA's lines of business and PICA's exposure to liability they would have known that PICA's surplus is dramatically overstated taking into consideration all of the exposure PICA has to Pruco Life and its own exposure to wholly owned captive reinsurance companies in Arizona and affiliates in Bermuda. In 2023 alone, PICA took

credit for reinsurance in the amount of $12.5 billion for liabilities ceded to Pruco Life, its wholly owned subsidiary that also cedes to PICA's wholly owned Arizona Captives. There does not appear to be any legitimate business reason for PICA to cede liabilities to wholly owned subsidiaries and when those subsidiaries also cede liabilities to other wholly owned PICA subsidiaries the circular nature of this shuffling around of obligations becomes clear. Unfortunately, circular reinsurance transactions with affiliates undermines policyholder security and puts pensioners at substantial risk that can be best described as "Enronesque".

112.    Had Defendants considered the structure of PICA and other indications of PICA's exposure to liability they would have known that PICA is dramatically under reserved.

113.    The concerns about the consequences of all of PICA's and RGA's suspect transactions with affiliates are real and imminent.    In 2024 alone, several life and annuity issuers were placed into rehabilitation or subjected to regulatory action as a direct and proximate result of imploded affiliated party reinsurance. These entities include the following:    Columbian Mutual Life Insurance Company ("Columbian Mutual"), Columbian Life Insurance Company ("Columbian Life"), PHL Variable Insurance Company, 777 Reinsurance Ltd. ("777 Re") and most recently Sentinel Security Life Insurance Company, Haymarket Insurance Company and Jazz Reinsurance Company (collectively, the "ACAP Companies"). The ACAP Companies were ordered to cease writing new business effective December 31, 2024, because the Utah Insurance Department determined that the ACAP Companies "are in a Hazardous Financial Condition and that such condition presents an immediate and significant danger to the public health, safety, or welfare, and that immediate action is necessary and in the public interest.[8] All of the recent

---

[8] https://insurance.utah.gov/wp-content/uploads/4699EmergencyOrder.pdf (last retrieved on December 27, 2024).

failures had one thing in common: excessive reliance upon non-arm's length reinsurance with affiliates and the exact same type of financial alchemy that plaintiffs complain of in this case.

114.    Columbian Mutual was placed into Rehabilitation by the New York State Department of Financial Services on August 13, 2024 following a failed merger and de-mutualization sponsored by Constellation Insurance Holdings, Inc.   When the NYS Department of Financial Services conducted asset adequacy testing, it required Columbian Mutual to contribute more than $100,000,000 to its asset adequacy reserves. This took Columbian Mutual's surplus from $25 million to negative $88 million overnight. This led to an immediate ratings downgrade and regulatory action by the State of New York Department of Financial Services and parallel regulatory action by the Insurance Commissioner of the State of Illinois where Columbian Life Insurance Company, an affiliate of Columbian Mutual, is domiciled.   While both Columbian Mutual and Columbian Life went from positive to negative surplus in short order, the adjustments to surplus have not yet taken into account the fact that Columbian Life ceded liabilities in the amount of $587 million to Columbian Mutual – liabilities that neither entity has the financial wherewithal to meet. Policyholders have been and will continue to be impacted as two separate state mandated Rehabilitation proceedings erode estate assets while regulators and their appointees sort through the mess.

115.    PHL Variable Insurance Companies and its subsidiaries, Concord Re, Inc. and Palisado Re, Inc. ("PHL") were ordered into Rehabilitation on May 20, 2024.   In connection with the PHL Rehabilitation, the Connecticut Insurance Commissioner determined that "further transaction of business would be financially hazardous to its policyholders, creditors and the public.   Many of the reasons for PHL's rehabilitation can be traced to non-arm's length reinsurance transactions with affiliates. See chart below which bears a striking similarity to the PICA charts set forth herein at paragraphs 93, 97, *supra*.



116.    As depicted above, PHL is heavily dependent upon reinsurance with affiliates and captives located in Connecticut and the Cayman Islands and reinsurance with another affiliate Nassau Life & Annuity Co. ("Nassau") and circular reinsurance and suspect ModCo transactions

with other Nassau and PHL affiliates.

117.    As a result of the rehabilitation, the PHL Rehabilitator issued a Temporary Moratorium Order limiting withdrawals to guaranty association cap limits.    Policyholders have been, and will continue to be impacted.

118.    Similarly, the recent regulatory action by the Utah Insurance Department and the South Carolina Insurance Department directed at the ACAP Companies stems from highly suspect affiliated party transactions that the ACAP insurers entered into with captives and affiliates to allow the regulated insurance companies to avoid scrutiny. All of this started to unwind when scandals surfaced related to 777 Partners, LLC, the direct parent company of 777 Re. 777 Re assumed billions in opaque Modco liabilities from the ACAP entities. 777 Re surrendered its reinsurance license to the Bermuda Monetary Authority on October 8, 2024, and the ACAP insurers recaptured all of the ceded ModCo liabilities. Now those liabilities (that never left the ACAP Companies in the first place) are in the hands of the Utah and South Carolina Departments of Insurance.

119.    All of the 2024 regulatory events highlight just how suspect and opaque affiliated party reinsurance and ModCo transactions can be and just how risky this type of financial alchemy is for unsuspecting policyholders including pensioners like putative class members herein.

120.    Based on the information set forth in this complaint, a reasonable independent fiduciary acting in the best interests of Plan Participants in accordance with ERISA's requirements could not possibly have chosen the PICA/RGA structure for Plaintiffs and other putative class members.

***Verizon's and State Street's choice of PICA and RGA was motivated by financial self-interest and was therefore disloyal and the transactions were prohibited by ERISA***

121.    In choosing PICA for one of the two annuity transactions at issue in this case, State Street systematically ignored red flags like affiliated party reinsurance, high concentrations of risky assets and circular ModCo transactions as set forth in paragraphs 60-62, 93, 96-97, 108, *supra*. State Street's reasons for doing so are suspect given its own substantial financial interests in both PICA (through PRU) and Verizon.

122.    State Street is also one of the largest shareholders in PRU, PICA's direct parent holding shares valued at more than $2 billion and State Steet also owns millions of shares of RGA's common stock, valued at more than $479 million.

123.    State Street's significant holdings in PRU and RGA are only outdone by its holdings in Verizon, which were recently valued at a staggering $7,705,192,743.00.

124.    Yet, despite obvious conflicts of interest, State Street claims to have acted as an "independent fiduciary" when it came to the choice of PICA and RGA for the instant Verizon transaction and State Street further claims that its choice of annuity provider was undertaken in the best interests of plan participants.

125.    If an Article III Judge owned billions in common stock in Prudential, RGA and Verizon, she would be duty bound to recuse herself from this case.   State Street's claim to have acted solely in the best interests of plan participants, even when it directly benefitted from Verizon off-loading liabilities to PICA and RGA doesn't pass the laugh test.

126.    Plaintiffs maintain that Defendants intentionally failed to conduct an independent and impartial investigation when selecting PICA and RGA for the instant PRT transaction. Plaintiffs further maintain and will prove that State Street was hired to provide "cover" for

Verizon's choice of PICA and RGA and to give the appearance of legitimacy to a process that was fatally flawed and contrived from the outset.

127.    Just prior to the Pension Risk Transfer to PICA and RGA, PICA valued its liabilities to the impacted plan participants at $5.9 billion yet Verizon only paid $5.7 billion to PICA and RGA resulting in an immediate profit of $200 million to Verizon. Said another way, $200 million in assets that were supposed to be invested for the sole and exclusive benefit of plan participants directly benefitted Verizon at plan participants' expense.

128.    The detailed data contained herein, all of which is publicly available, shows that PICA and RGA are entirely dependent upon affiliates domiciled in secrecy jurisdictions to make good on their liabilities to Plaintiffs. The interdependence among affiliates within the same controlled group of companies, and the excessive amounts of sham reinsurance with captives and affiliates located in Arizona, Bermuda, Barbados and Missouri would have led a loyal and prudent fiduciary to conclude that PICA and RGA were not safe annuity providers for the 56,000 hard earned pensions that were dumped on them by Verizon with State Street's blessing.

129.    The deal with PICA and RCA immediately reduced the value of Plaintiffs pension benefits. At the same time, by offloading liabilities to PICA and RGA, Verizon improved its own financial position to the delight of one of its largest institutional investors- State Street. This type of self-dealing turns fiduciary duties on their head and is not permitted under ERISA.

130.    The selection of PICA and RGA took away all of the uniform protections intended by Congress under ERISA and reduced earned benefits to which Plaintiffs were entitled to benefits that are substantially and quantifiably less valuable.

131.    Plaintiffs did not choose PICA or RGA and Plaintiffs had no say in any aspect of Verizon's decision to kick them out of the Plans. Plaintiffs are also stuck as certificate holders

under a group annuity contract they do not control and cannot surrender or exchange for an individual annuity contract with a better capitalized mutual insurance company owned by policyholders rather than shareholders like State Street.

## CLASS ALLEGATIONS

132.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23. They seek to represent the 56,000 Plan participants and beneficiaries ejected from the Plan by the PICA and RGA transactions (the "Class").

133.    Plaintiffs are empowered to bring this action under 29 U.S.C. § 1132(a)(2), (a)(3) and (a)(9).

134.    <u>Numerosity</u>: The 56,000 member Class is so numerous that joinder of all members is impracticable.

135.    <u>Commonality</u>: There are questions of law and fact common to the class because class members' claims are identical to one another and predicated on the common contention that they were injured by the transfer of their pension liabilities to PICA and RGA in violation of ERISA. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include:

(i)     Did Verizon breach its fiduciary duties when they selected PICA and RGA as annuity providers?

(ii)    Did State Street breach its fiduciary duty when it assisted Verizon in entering into, and itself entered into, the transaction?

(iii)   Was the transaction *per se* unlawful under ERISA?

(iv)    Did Verizon and State Street engage in impermissible self-dealing?

(v)    Did the analysis performed by Verizon and State Street that led Verizon and State Street to select PICA and RGA as annuity providers satisfy those entities' fiduciary obligations?

(vi)   Should the Court order injunctive relief that ensures Plaintiffs will be able to obtain their full retirement benefits?

(vii)  Should the Court order Verizon to disgorge the hundreds of millions in profit that it secured by breaching its fiduciary duty, including, but not limited to the $200,000,000.00 in immediate profit that Verizon realized by improperly transferring $5.7 billion in plan assets to cover $5.9 billion in associated liabilities from the Plans, plus pre and post judgment interest?

(viii) Should the Court require Verizon to pay the amount it will save in annual PBGC premiums (fixed and variable rate premiums) into a fund for the benefit of de-risked plan participants?

136.   <u>Typicality</u>: The named plaintiffs' claims are typical of the Class's claims. The named plaintiffs' claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

137.   <u>Adequacy</u>: The named plaintiffs will fairly and adequately protect the interests of the Class. The named plaintiffs have no interest antagonistic to those of the other members of the Class. The named plaintiffs are committed to the vigorous prosecution of this action. They have retained counsel who specialize in the substantive law of ERISA and pension plans, and who are experienced and competent in the prosecution of large class actions, including those arising under ERISA.

138.   <u>Rule 23(b)(1)</u>: The prerequisites for a (b)(1) class are satisfied. Prosecution of

51

separate actions by Class members would risk establishing incompatible standards of conduct for Defendants. Additionally, adjudications as to individual Class members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

139.    <u>Rule 23(b)(2)</u>: The prerequisites for a (b)(2) class are satisfied. Defendants' misconduct was generally applicable to the Class. The injunctive relief that Plaintiffs seek affects the Class as a whole. Individual Class members do not have an interest in prosecuting their claims in this action individually because Class members' claims are identical, and the injunctive relief sought will affect each Class member equally.

140.    <u>Rule 23(b)(3)</u>: The prerequisites for a Rule 23 (b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Class-wide litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class members' claims in one action.

## COUNT I: BREACH OF FIDUCIARY DUTY
*Against Verizon*

141.    The foregoing allegations are incorporated by reference herein.

142.    Verizon was, at all relevant times, a fiduciary with respect to the Plans.

143.    Under 29 U.S.C. § 1104(a)(1), they were thus required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."   This duty requires that ERISA plans be operated for the "exclusive benefit" of plan participants, and ERISA relatedly provides that, except in limited circumstances inapplicable here, "the assets of a plan shall never inure to the benefit of any

employer." 29 U.S.C. § 1103(c)(1). Verizon was also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

144.    Verizon breached these fiduciary duties of loyalty and prudence when they selected PICA/RGA as the annuity providers to receive Plaintiffs' pension assets and take on the corresponding liabilities, thereby enabling Verizon to receive hundreds of millions of dollars in ill-gotten gains.

145.    Neither PICA, nor RGA was a safe, or a reasonable choice of annuity provider.

146.    In order to satisfy their fiduciary duties under ERISA, plan fiduciaries must take steps to obtain the safest annuity available, which requires an objective, thorough search to determine which annuity provider is best for plan participants.

147.    PICA and RGA were not the safest annuities available, its selection was not in Plaintiffs' best interest, and Verizon did not take the necessary steps to obtain the safest annuities available as required by ERISA.

148.    The transfer of Plaintiffs' pension liabilities to PICA/RGA has caused Plaintiffs immediate and irreparable injury – notably the loss of ERISA's uniform protections and the financial backstop provided by the PBGC.

149.    As a result of the PICA/RGA transaction, the overall value of Plaintiffs' pension benefits decreased using objective and calculable metrics.  Overall, Plaintiffs' benefits were reduced by the PRT deal and their pension benefits are far less secure as a result of the transaction. Plaintiffs are also subject to a materially increased and substantial risk that they will not receive the full earned retirement benefits to which they are entitled.

150.    In addition, by transferring $200 million less in assets to support the $5.9 billion in liabilities that were transferred to PICA and RGA, Verizon put its own financial interest in front of the interest of plan participants in violation of ERISA.

151.    The Verizon Defendants valued plan liabilities for the 59,000 impacted plan participants at $5.9 Billion just prior to the purchase of the Group Annuity Contracts at issue in this case from PICA and RGA.

152.    Yet, Verizon only transferred $5.7 Billion in plan assets to PICA and RGA and recorded a net pre-tax settlement gain of $200,000,000 as a result of the pension annuitization transactions described herein.

153.    In other words, instead of using the appropriate amount of plan assets to cover plan liabilities, Verizon and State Street orchestrated a transaction that directly benefitted the Verizon Defendants at plan participants' expense.

### COUNT II: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES
*Against State Street*

154.    The foregoing paragraphs 1 – 140 are incorporated by reference.

155.    As a fiduciary, State Street was, like Verizon, required to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a). It was also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

156.    As a fiduciary, State Street also is liable for "the acts of another fiduciary with respect to the same plan" in the following circumstances:

(i)     if it participated knowingly in, or knowingly undertook to conceal, an act or omission of such fiduciary, knowing such act or omission was a breach;

(ii)    if, by its failure to comply with 29 U.S.C. § 1104(a)(1) in the administration of its specific responsibilities which gave rise to its status as a fiduciary, it has enabled such other fiduciary to commit a breach; or

(iii)   if it had knowledge of a breach by such other fiduciary, unless it made reasonable efforts under the circumstances to remedy the breach.

157.    State Street breached these duties through its participation and assistance in Verizon's unlawful annuity transaction with PICA/RGA on behalf of the Plans.

158.    State Street's actions did not comply with ERISA's "prudent person" standard of care.

159.    State Street knowingly participated in, enabled, and made no reasonable efforts to remedy Verizon's fiduciary breaches, including Verizon's prohibited transactions with State Street and PICA/RGA.

## COUNT III: KNOWINGLY PARTICIPATING IN A BREACH OF FIDUCIARY DUTY
*Against All Defendants for the Selection of PICA and RGA*

160.    Paragraphs 1 - 140 are incorporated herein by reference.

161.    Sections 1132(a)(3) and 1132(a)(9) not only empower individuals to bring actions when their status as plan participants is terminated by annuitizations that violate ERISA, it also imposes substantive duties on certain non-fiduciaries.

162.    Specifically, it creates liability for non-fiduciaries who knowingly participate in a fiduciary breach in violation of ERISA, 29 U.S.C. § 1104.

163.    Plaintiffs thus allege, in the alternative to Counts I and II, that, even if any of the Defendants were non-fiduciaries for the purpose of the annuitization, those Defendants are liable

under Sections 1132(a)(3) and 1132(a)(9) for participating in a fiduciary's ERISA violation. Among other things, all Defendants knew of the circumstances that rendered the other's conduct a breach of fiduciary duty and participated in that breach.

164.    Specifically, Verizon ostensibly engaged State Street for the purpose of selecting an annuity provider; yet Verizon knew that State Street was one of Verizon's largest institutional shareholders; knew that State Street's investigation of available annuity providers could not be objective or sufficiently thorough and reeked of self-dealing; knew that the deficient selection of PICA and RGA instead of a prudent alternative annuity provider would generate a massive corporate benefit for Verizon and State Street; and knowingly accepted those benefits by entering into the annuitizations with PICA and RGA that were "recommended" by State Street.

165.    Moreover, the Verizon Defendants had actual or constructive knowledge that the amounts that were transferred from the Plans to PICA and RGA were insufficient to secure the liabilities, and the Verizon Defendants had knowledge of each entity's fiduciary and/or party-in-interest status.

166.    Likewise, State Street knew or should have known that the consideration paid to PICA and RGA was $200,000,000.00 less than the present value of the liabilities associated with the off-loaded plan participants.   State Street also had knowledge of each entity's fiduciary and/or party-in-interest status.

### COUNT IV: PROHIBITED TRANSACTION
*Against Verizon; State Street as party in interest*

167.    Paragraphs 1 – 140 are incorporated by reference herein.

168.    Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect . . . furnishing of services between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

169.    Verizon was at all times a fiduciary to the Plan.

170.    Verizon caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between State Street and the Plan.

171.    When Verizon caused the Plan to engage in the annuity transaction, State Street was a party in interest, including because State Street was a fiduciary of the Plan and a person providing services to the Plan. 29 U.S.C. § 1002(14). Verizon knew of that fact when they caused the Plan to engage in the annuity transaction.

172.    Even if Verizon were not a fiduciary with respect to the relevant conduct, it is liable under 29 U.S.C. § 1132(a)(3) as a nonfiduciary party in interest, including because it knowingly participated in the breach or violation of other persons, including State Street.

## COUNT V: PROHIBITED TRANSACTION
*Against State Street; Verizon as party in interest*

173.    Paragraphs 1 – 140 are incorporated by reference herein.

174.    State Street was at all relevant times a fiduciary to the Plan.

175.    State Street caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan, on one hand, and Verizon, on the other hand; (ii) furnishing of services between the Plan and Verizon; and (iii) the transfer to, or use by or for the benefit of Verizon, of Plan assets.

176.    When State Street caused the Plan to enter into the annuity transaction, Verizon and State Street were parties in interest, including because they were fiduciaries of the Plan and persons providing services to the Plan. 29 U.S.C. § 1002(14). State Street knew of these facts when it caused the Plan to engage in the annuity transaction.

177.    Even if State Street were not a fiduciary with respect to the relevant conduct, it is liable under 29 U.S.C. § 1132(a)(3) as a nonfiduciary party in interest, including because it knowingly participated in the breach or violation of other persons, including State Street.

## COUNT VI: PROHIBITED TRANSACTION
*Against Verizon and State Street; PICA as party in interest*

178.    Paragraphs 1 – 140 are incorporated by reference herein.

179.    Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect . . . furnishing of services between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

180.    Verizon and State Street were at all times fiduciaries to the Plan.

181.    Verizon and State Street also caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan (on one hand) and PICA (on the other hand),; (ii) furnishing of services between the Plan and PICA,; and (iii) transfer to, or use by or for the benefit of PICA, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D);

182.    When Verizon caused the Plan to engage in the annuity transaction, PICA was a party in interest, including because PICA was a person providing services to the Plan. 29 U.S.C. § 1002(14). Verizon and State Street knew of that fact when they caused the Plan to engage in the annuity transaction.

183.    Even if either Verizon or State Street was not a fiduciary with respect to the relevant conduct, the nonfiduciary entity would be liable for knowingly participating in the other entity's breach and failing to make any reasonable effort under the circumstances to remedy the breach.

## COUNT VII: PROHIBITED TRANSACTION
*Against Verizon and State Street; RGA as party in interest*

184.    Paragraphs 1 – 140 are incorporated by reference herein.

185.    Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect . . . furnishing of services between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

186.    Verizon and State Street were at all times fiduciaries to the Plan.

187.    Verizon and State Street also caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan (on one hand) and RGA (on the other hand); (ii) furnishing of services between the Plan and RGA; and (iii) transfer to, or use by or for the benefit of RGA, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D);

188.    When Verizon caused the Plan to engage in the annuity transaction, RGA was a party in interest, including because RGA was a person providing services to the Plan. 29 U.S.C. § 1002(14). Verizon and State Street knew of that fact when they caused the Plan to engage in the annuity transaction.

189.    Even if either Verizon or State Street was not a fiduciary with respect to the relevant conduct, the nonfiduciary entity would be liable for knowingly participating in the other entity's breach and failing to make any reasonable effort under the circumstances to remedy the breach.

## COUNT VIII: PROHIBITED TRANSACTION
*Against All Defendants*

190.    Paragraphs 1 - 140 are incorporated by reference herein.

191.    The annuity transaction between Verizon and PICA and the annuity transaction between Verizon and RGA was prohibited under 29 U.S.C. § 1106(b).

192.    By using Plan assets to purchase the PICA annuity and the RGA annuity, instead of safe annuities, so as to increase Verizon profits, the Defendants and State Street dealt with the assets of the Plans assets in their own interest or for their own account; and acted on behalf of parties (Verizon, PICA, RGA, and State Street) whose interest in using a risker, lower-cost annuity provider were adverse to the interests of Plan participants and their beneficiaries in obtaining a safe annuity. 29 U.S.C. § 1106(b)(1)-(2).

## PRAYER FOR RELIEF

Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court:

A.  Certify the Class under Federal Rule of Civil Procedure 23, appoint Plaintiffs Maureen Dempsey, Heinz E. Schlenkermann, and Chris Shelton as Class representatives and appoint their attorneys as Class counsel to represent the members of the Class;

B.  Order the Defendants to guarantee the annuities purchased from PICA/RGA through the purchase, at their expense, of appropriate guarantees from reliable re-insurers selected at arm's length through appropriate procedures or the posting of appropriate security, such as a surety bond;

C.  Order Verizon, through Plan amendment or otherwise, to place the group annuity contracts inside the Plan as a Plan asset and to return the Class members to their former status as Plan participants;

D.  Order Verizon to remain secondarily liable for Plaintiffs' pension benefits in the event of a PICA insolvency or impairment;

E.  Order Verizon and State Street to Disgorge the profit that they earned from the unlawful transactions, plus interest dating back to July 1, 2024;

F.  Order that Verizon contribute the amount it would have been required to pay to the PBGC in the form of fixed rate and variable rate premiums into a fund for the benefit of all impacted plan participants and their spouses and/or beneficiaries;

G.  Order any appropriate and further relief that this Court deems just, proper and equitable.

Plaintiffs also seek pre-judgment and post-judgment interest, plus an award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132 (g) and/or the common fund doctrine.

Dated: December 30, 2024

*/s/ Edward S. Stone*
Edward S. Stone, Esq. (NY Bar #2259489)
EDWARD STONE LAW P.C.
575 Lexington Avenue, 14th Floor
New York, NY 10022
Tel: (203) 504-8425 / Fax: (203) 348-8477
eddie@edwardstonelaw.com
Mailing Address:
175 W. Putnam Ave., 2nd Floor
Greenwich, CT 06830

Elizbeth Hopkins, Esq.
(*pro hac vice to be filed*)
KANTOR & KANTOR, LLP
9301 Corbin Avenue, Suite 1400
Northridge, CA 91324
Telephone: (877) 783-8686
Facsimile: (253) 285-1849
ehopkins@kantorlaw.net

*Attorneys for Plaintiffs*