UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- X
MAUREEN DEMPSEY, HEINZ E.                            :
SCHLENKERMANN, CHRIS SHELTON AND                    :
DIANA VARGAS, INDIVIDUALLY, AND AS                  :
REPRESENTATIVES OF PLAN                             :
PARTICIPANTS AND PLAN BENEFICIARIES                 :
OF THE VERIZON MANAGEMENT PENSION                   :
PLAN AND THE VERIZON PENSION PLAN                   :
FOR ASSOCIATES,                                     :
                                                    :
                                     Plaintiffs,    :
            -against-                               :
                                                    :
                                                    :
VERIZON COMMUNICATIONS, INC.,                       :
VERIZON EMPLOYEE BENEFITS                           :
COMMITTEE, AS PLAN ADMINISTRATOR;                   :
VERIZON CALIFORNIA INC., AS PLAN                    :
SPONSOR OF THE VERIZON PENSION                      :
PLAN FOR ASSOCIATES; VERIZON                        :
CORPORATE SERVICES GROUP INC., AS                   :
PLAN SPONSOR OF THE VERIZON                         :
MANAGEMENT PENSION PLAN, AND                        :
STATE STREET GLOBAL ADVISORS TRUST                  :
CO.,                                                :
                                                    :
                                     Defendants.    :
------------------------------------------------------- X
```

**OPINION AND ORDER
DISMISSING COMPLAINT**

24 Civ. 10004 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

Plaintiffs Maureen Dempsey, Heinz E. Schlenkermann, Chris Shelton, and Diana Vargas

filed this Employee Retirement Income Security Act ("ERISA") action, on behalf of themselves

and a putative class of similarly situated persons, against Verizon Communications Inc., Verizon

Employee Benefits Committee, Verizon California Inc., and Verizon Corporate Services Group

Inc. (collectively "Verizon"), and State Street Global Advisors Trust Co. ("State Street").

Plaintiffs were former participants in the Verizon Management Pension Plan and the Verizon

Pension Plan for Associates (the "Plans"), defined benefit pension plans protected by the

Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. § 1001 *et seq*.

ERISA imposes fiduciary duties on plan sponsors and bars fiduciaries from participating in certain prohibited transactions. Plaintiffs allege that Defendants breached their fiduciary duties and engaged in prohibited transactions by purchasing annuities from Prudential Insurance Company of America ("PICA") and RGA Reinsurance Company ("RGA") (collectively the "Annuity Providers") as a means of terminating the Plans through a pension risk transfer.

Verizon and State Street move to dismiss Plaintiffs' amended complaint ("Amended Complaint" or "AC"). Dkt. No. 55. For the following reasons, Defendants' motions are GRANTED and the case is DISMISSED with prejudice.

## BACKGROUND

### I.  Statutory Background

ERISA provides a federal statutory framework to regulate and protect the security of retirement pension plans. The Act requires the pension plan assets to be held in trust and imposes fiduciary duties on the plan's managers and sponsor to safeguard those assets. 29 U.S.C. §§ 1103(a), 1104(a). These duties require, in part, that the fiduciary act "with respect to a plan solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a). ERISA defines a fiduciary to include a named fiduciary and anyone who exercises discretionary authority over the plan or plan assets.

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or

indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29. U.S.C. § 1002(21)(A).

ERISA additionally imposes funding requirements on the plan sponsor, requiring it to minimally fund and contribute to the plan to meet obligations. 29 U.S.C. §§ 1082-1085. These requirements demand that the sponsor make contributions in certain circumstances, including when the investments are insufficient to satisfy the obligations to beneficiaries. AC ¶ 40.

ERISA explicitly prohibits certain types of transactions by statute. 29 U.S.C. § 1106. As relevant here, under Section 1106(a), "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a). ERISA defines a party in interest as any person "providing services to [a] plan." 29 U.S.C. § 1002(14)(A).

Additionally, under Section 1106(b), a fiduciary may not engage in self-dealing with the plan assets.

A fiduciary with respect to a plan shall not— (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

Pension plans typically take one of two forms: defined-contribution plans and defined-benefit plans. In a defined-benefit pension plan, the plan sponsor agrees to pay a fixed-amount of monthly pension benefits to the plan participants for the rest of their lives. AC ¶ 38. The plan

sponsor funds the payment of those benefits through assets set aside by the sponsor at the creation of the plan and contributed to over time, as governed by ERISA-funding requirements.  AC ¶ 38-40.

ERISA plans are protected by insurance administered by the federally-backed Pension Benefit Guaranty Corporation ("PBGC").  In the event of sponsor default, PBGC pays the benefits of an ERISA plan up to an annual limit based on the recipient's age, as set in a schedule each year.  AC ¶¶ 19, 59.  PBGC does not impose a lifetime maximum payment limit.

ERISA contemplates and permits a plan sponsor to terminate a retirement plan, including through the purchase of an annuity.  29 U.S.C. § 1341(b)(3)(A)(i).

> In connection with any final distribution of assets pursuant to the standard termination of the plan under this subsection, the plan administrator shall distribute the assets in accordance with section 1344 of this title. In distributing such assets, the plan administrator shall-- (i) purchase irrevocable commitments from an insurer to provide all benefit liabilities under the plan…

> 29 U.S.C. § 1341(b)(3)(A)

Section 1341 sets out certain procedural requirements for the termination of a plan, including a requirement that "when the final distribution of assets occurs, the plan is sufficient for benefit liabilities."  29 U.S.C. § 1341(b)(1)(D).

> As soon as practicable after the date on which the notice of intent to terminate is provided pursuant to subsection (a)(2), the plan administrator shall send a notice to the corporation setting forth--

> (i) certification by an enrolled actuary--

> (I) of the projected amount of the assets of the plan (as of a proposed date of final distribution of assets),

> (II) of the actuarial present value (as of such date) of the benefit liabilities (determined as of the proposed termination date) under the plan, and

> (III) that the plan is projected to be sufficient (as of such proposed date of final distribution) for such benefit liabilities,

4

(ii) such information as the corporation may prescribe in regulations as necessary to enable the corporation to make determinations under subparagraph (C), and

(iii) certification by the plan administrator that--

(I) the information on which the enrolled actuary based the certification under clause (i) is accurate and complete, and

(II) the information provided to the corporation under clause (ii) is accurate and complete.

29 U.S.C. § 1341(b)(2)

When a plan sponsor decides to terminate a plan through the purchase of an annuity, the plan sponsor transfers the plan assets to a third-party insurance company. The assets serve as a one-time insurance premium payment to purchase an annuity contract on behalf of the retirement plan beneficiaries. The insurance company then assumes the responsibility to pay the beneficiaries their defined-benefit entitlements, and the original plan sponsor is no longer liable for such payments. Such transactions are referred to as "Pension Risk Transfers" or "PRTs." The amount due to the beneficiaries remains the same before and after a PRT.

The completion of a PRT terminates the plan under ERISA and therefore removes the plan from the ERISA system, meaning the regulatory system, funding requirements, and PBGC are no longer applicable. Instead, the annuity plans are subject to state law regulation and insured by state assurance guarantee associations ("SGAs"). AC ¶ 20. SGAs are non-profit organizations that serve the same role as the PBGC, providing payment in the event of the default of the annuity provider paying the retirees' defined benefits. AC ¶ 59. Insurance companies that issue annuities are required to belong to the SGA of each state where they do business. *See* www.annuity.org/annuities/regulations/state-guaranty-associations/ (last visited January 8, 2026). SGAs vary in the amount of coverage they provide by state and typically impose lifetime maximum payments ranging from $250,000-500,000. AC ¶ 59.

In 1993, Congress enacted the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401 (Oct. 22, 1993), which provides a specific cause of action for pension plan beneficiaries to sue where a fiduciary breaches its duties when executing a PRT.  29 U.S.C. § 1132(a)(9).

> [I]n the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title or the terms of the plan, by    the Secretary, by    any    individual    who    was a participant or beneficiary at the time of the alleged violation, or by a fiduciary, to obtain appropriate relief, including the posting of security if    necessary,    to    assure    receipt    by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts

29 U.S.C. § 1132(a)(9).

The Department of Labor issued Interpretive Bulletin 95-1 relating to the fiduciary standards under ERISA when selecting an annuity provider for a defined benefit pension plan. Interpretive Bulletin 95-1 provides that "fiduciaries choosing an annuity provider for the purpose of making a benefit distribution must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise."  29 C.F.R. § 2509.95-1(c).  The Interpretive Bulletin provides a set of factors for the fiduciary to consider in making its selection, as quoted below, and additionally "recognizes that there are situations where it may be in the interest of the participants and beneficiaries to purchase other than the safest available annuity" including "where the safest available annuity is only marginally safer, but disproportionately more expensive than competing annuities, and the participants and beneficiaries are likely to bear a significant portion of that increased cost."  29 C.F.R. § 2509.95-1(d).

> In conducting such a search, a fiduciary must evaluate a number of factors relating to a potential annuity provider's claims

paying ability and creditworthiness. Reliance solely on ratings provided by insurance rating services would not be sufficient to meet this requirement. In this regard, the types of factors a fiduciary should consider would include, among other things:

      **(1)** The quality and diversification of the annuity provider's investment portfolio;

      **(2)** The size of the insurer relative to the proposed contract;

      **(3)** The level of the insurer's capital and surplus;

      **(4)** The lines of business of the annuity provider and other indications of an insurer's exposure to liability;

      **(5)** The structure of the annuity contract and guarantees supporting the annuities, such as the use of separate accounts;

      **(6)** The availability of additional protection through state guaranty associations and the extent of their guarantees. Unless they possess the necessary expertise to evaluate such factors, fiduciaries would need to obtain the advice of a qualified, independent expert. A fiduciary may conclude, after conducting an appropriate search, that more than one annuity provider is able to offer the safest annuity available.

29 C.F.R. § 2509.95-1(c).

## II.    Factual Background

### A.    The Pension Risk Transfer Transaction

Verizon is a telecommunications company.  Verizon offers its employees pension benefit plans, as administered through the various Verizon Defendants, including the Plans at issue here. AC ¶ 33-36.  The Plans were defined-benefit pension plans, governed by ERISA.  AC ¶ 1. Plaintiffs are retiree-beneficiaries of the Verizon Plans who bring suit on behalf of a putative class of similarly situated Verizon beneficiaries.  *Id.*  Plaintiffs and the putative class had their Plans terminated through a PRT that purchased annuity contracts with PICA and RGA.

PICA and RGA are insurance companies who offer pension annuity products.  PICA is a subsidiary of Prudential Financial, Inc. ("Prudential").  AC ¶ 7.  Prudential and RGA are public companies who publish annual reports pursuant to Section 13 or 15(d) of the Securities Exchange

7

Act of 1934. Prudential's annual reports additionally contain information about its subsidiaries, including PICA. For each company, the annual reports on Form 10-K show strong financial performances and high credit ratings. *See* Prudential Financial, Inc., Annual Report (Form 10-K) (Feb. 17, 2025); Reinsurance Group of America, Inc., Annual Report (Form 10-K) (Feb. 21, 2025). In 2024, PICA had high financial strength ratings from major agencies (AA- (S&P), Aa3 (Moody's), AA- (Fitch), A+ (A.M. Best)) and had $48.5 billion in general account assets supporting $50.8 billion in liabilities. Prudential Financial, Inc., Annual Report (Form 10-K) (Feb. 17, 2025) at 129, 254. In 2024, RGA had high credit ratings (A+ (A.M. Best), A1 (Moody's) and AA- (S&P)) and $118.67 billion in total assets with $107.8 billion of total liabilities. Reinsurance Group of America, Inc., Annual Report (Form 10-K) (Feb. 21, 2025) at 14, 90.

Verizon hired State Street to act as an independent fiduciary for the selection of annuity providers for the Annuity Transaction. AC ¶ 6-7, 37. State Street is an investment management company that provides investment services on behalf of clients, including holding stock in companies and indexes on behalf of clients. *See* Santos Decl., Ex. 1-4.

Verizon decided to pursue an annuity transaction to terminate the Plans (the "Annuity Transaction"). AC ¶ 57. On February 29, 2024, Verizon executed an amendment to the Plans requiring Verizon to purchase group annuity contracts that would fully guarantee and pay the benefits of the Plan participants. Carlo-Gonzalez Decl., Ex. A. On March 6, 2024, Verizon entered into two group annuity contracts transferring $5.7 billion in plan assets to PICA and RGA. AC ¶ 2. This comprised of an approximately $1.9 billion transfer from the Plans to RGA and a $3.8 billion transfer from the Plans to PICA. Carlo-Gonzales Decl., Ex. C, D. As a result of the Annuity Transaction, Verizon wrote off $5.9 billion in pension liabilities. AC ¶ 57.

Under the annuity contracts, Verizon paid an initial premium in cash and non-cash (the Plan assets) to the Annuity Providers in exchange for them assuming the obligation to make annuity payments to the Plan beneficiaries.  Carlo-Gonzalez Decl., Ex. B.  The contract obligates the Annuity Providers to place the Plan assets into a separate fund apart from their general funds, prohibits the reinsurance or assignment of the obligations of liabilities from the contracts unless the beneficiaries consent or the Annuity Providers remain obligors to the beneficiaries, and prohibits the transfer of Plan assets in any instance.  Carlo-Gonzalez Decl., Ex. C, D.

## B.    Plaintiffs' Allegations

Plaintiffs allege Verizon and State Street breached their fiduciary duties and engaged in a prohibited transaction when executing the Annuity Transaction.  Plaintiffs point to the failure of the Executive Life Insurance Company ("Executive Life") in 1991 as an example of the risk of annuity provider collapse.  AC ¶ 48.  In the 1980s many employers terminated pension plans by executing PRTs with annuity providers, including Executive Life.  AC ¶¶ 46-47.  In 1991, Executive Life became insolvent, after investing in high-risk bonds, and failed to make payments to tens of thousands of pension annuitants.  AC ¶¶ 49-50.

In regard to the Annuity Transaction, Plaintiffs allege that the problem is clear on its face: Verizon provided only $5.7 billion in Plan assets in support of $5.9 billion in liabilities.  AC ¶ 144. By "paying PICA and RGA $200,000,000.00 less than the actuarial value of the annuitized benefits using Verizon's own pre-annuitization values," Defendants "clearly violate[d] ERISA."  AC ¶ 22. Plaintiffs allege that this demonstrates that the Annuity Providers were unsuitable, and a reasonable fiduciary would not have selected them.

At a high level, Plaintiffs allege the Annuity Providers' use of captive reinsurance and Modified Co-Insurance ("ModCo") reduces transparency, increases liabilities, and increases risk of default.  In a reinsurance contract the ceding insurance company transfers a portion of its

liabilities, premiums, and associated assets to a reinsurance company. AC ¶ 81. The ceding insurer remains liable to its policyholders but also has claims against its reinsurer. *Id.* In a ModCo transaction, the ceding insurer transfers the risks and premiums of the portion of the policy but does not transfer the corresponding assets. *Id.* Instead, the ceding insurer credits the ModCo with the investment returns on the assets. *Id.*; *see also Colonial Am. Life Ins. Co. v. C.I.R.*, 491 U.S. 244, 248 n.2 (1989).

Plaintiffs allege that these methods reduce transparency and increase the amount of liabilities taken on by the Annuity Providers. The Complaint includes allegations of PICA and RGA's 2023 financial disclosures that show a "shocking" balance of "affiliated party reinsurance and ModCo" compared to the Annuity Providers' surplus. AC ¶ 70. Plaintiffs allege that "if even a portion of the $72.8 billion in affiliated party reinsurance and ModCo is problematic, PICA will face extreme liquidity and solvency concerns." *Id.* Further, Plaintiffs allege that the Annuity Providers' total surpluses depend heavily on wholly owned captives. AC ¶¶ 73-74. Plaintiffs allege that the "circular non-arm's length reinsurance among affiliates within the same controlled group exposes class members to significant and quantifiable risk." AC ¶ 75.

Plaintiffs note that many of the captive reinsurers are located in "regulation light" jurisdictions that impose fewer regulations and reporting requirements, like Arizona and Bermuda. AC ¶ 91. By choosing such locations, Plaintiffs allege that the Annuity Providers are "systematically circumventing state insurance reserve requirements" and "exploit[ing] looser reserve and regulatory requirements and more favorable tax treatment." *Id.* Plaintiffs contend that in these "secrecy jurisdictions … financial records are not publicly available, and reserve requirements are lax." AC ¶ 85.

Plaintiffs allege that the Annuity Providers' "excessive exposure to ModCo" is a "red flag" that an ERISA fiduciary should have noticed.  AC ¶ 83.  Plaintiffs contend that the ModCo practices used by the Annuity Providers allows them to "hold much less capital in the form of reserves than insurance companies that do not use ModCo -all other things being equal." AC ¶ 81. "This allows ceding insurers like PICA to artificially inflate their risk-based capital ('RBC') ratios – a metric prescribed by the National Association of Insurance Commissioners ('NAIC') to impose safe capital requirements on all insurance companies in order to avoid regulatory action and protect against insolvency." AC ¶ 81.  RBC calculates the capital an insurance company needs to support against risks.  *Id.*  A low RBC ratio can lead to regulatory action.  *Id.*

Throughout the Amended Complaint, Plaintiffs allege that a fiduciary should have been aware of these red flags and should have known the PICA and RGA were not suitable annuity providers, alleging that "[e]ven a cursory review of PICA's statutory filings reveals a shocking dependence on affiliated party transactions with wholly owned affiliates and captive reinsurers and affiliates in Bermuda." AC ¶ 69.  Plaintiffs allege that these numerous issues mean that many of the reinsurers and ModCos will "never be able to pay" creating a high likelihood that the Annuity Providers will be unable to meet their obligations to Plaintiffs.  AC ¶ 111.

Additionally, Plaintiffs contend that in the allegedly likely event of the Annuity Providers' default, the state insurance programs would be insufficient to cover their full benefits.  AC ¶¶ 59-60.  Plaintiffs give the example of California where the state program pays only 80% of the benefit. *Id.*

### C.    Procedural History

Plaintiffs filed this case on December 30, 2024 and filed an amended complaint on April 25, 2025.  Plaintiffs allege eight counts against Verizon and State Street: breach of fiduciary duty (Counts I and II); knowing participation in breach of fiduciary duty (Count III); and prohibited

transactions (Counts IV, V, VI, VII, and VIII).  As remedies, Plaintiffs seek: An order for Defendants to guarantee the annuities purchased from PICA and RGA; an order placing the annuity contracts inside the Plan and returning the Plan to be under Verizon; an order that Verizon remain secondarily liable for Plaintiffs' pension benefits in the event of insurer insolvency; disgorgement of profits by Verizon and State Street; and an order for Verizon to contribute the amount it would have been required to pay to the PBGC in the form of fixed rate and variable rate premiums into a fund for the benefit of all impacted plan participants and their beneficiaries.

Defendants filed the present motions to dismiss on May 30, 2025.  Briefing on the motions completed on August 8, 2025.  Oral argument was held on December 2, 2025.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of alleging facts to demonstrate each element of standing.  *Warth v. Seldin*, 422 U.S. 498, 517–18 (1975).  A plaintiff must allege the standing requirements "with the manner and degree of evidence required at the successive stages of the litigation" such that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support a claim."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "For purposes of ruling on a motion to dismiss for want of standing, [the trial court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth*, 422 U.S. at 501.  Though, the Court "need not credit a complaint's conclusory statements without reference to its factual context."  *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021).

To survive a Rule 12(b)(6) motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing a motion to dismiss, the Court must assume all well-pled facts to be true and "draw[] all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the court need not accept conclusory allegations. A complaint may be dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief" as a matter of law. *Twombly*, 550 U.S. at 558.

In considering a Rule 12(b)(6) motion to dismiss, a court "may review only a narrow universe of materials," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016), including "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021). For a Rule 12(b)(1) motion, the court may refer to evidence outside of the pleadings "where jurisdictional facts are placed in dispute." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022).

## DISCUSSION

As discussed further below, Plaintiffs have not alleged an injury that confers Article III standing because they have not alleged a substantial risk that the Annuity Transaction will result in a failure for Plaintiffs to receive their full defined pension benefits, that there is a present injury from diminished value, or that equitable remedies provide standing. Therefore, I dismiss the case for lack of standing. Despite finding no standing, I additionally consider and dismiss Plaintiffs' claims of breach of fiduciary duty and prohibited transactions for failure to state a legally sufficient claim.

I.    **Plaintiffs fail to adequately allege an injury to confer Article III standing.**

Plaintiffs assert three theories of standing: (1) seeking equitable remedies creates standing absent actual injury; (2) there is a present diminished value of the Plans that creates injury; and (3) there is a substantial risk of future harm because of the substantial risk that the annuity providers are likely to default.

Article III of the Constitution confers the federal courts with the authority to decide cases and controversies.  The standing doctrine "ensure[s] that federal courts do not exceed their authority." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The "irreducible constitutional minimum" of standing contains three elements: (1) injury in fact; (2) causation; and (3) redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  First, an injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent, not conjectural or hypothetical."  *Id.* (citations omitted).  Second, causation requires that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* (cleaned up). Third, redressability means that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* (quotation marks omitted).

In *Thole v. U.S. Bank N.A.*, the Supreme Court recently considered and discussed standing in the context of defined-benefit pension plans.  590 U.S. 538 (2020).  The plaintiffs in *Thole* were a putative class of participants in a defined-benefit retirement plan governed by ERISA.  *Id.* at 540. Plaintiffs alleged that mismanagement of the plan assets resulted in a loss of $750 million.  *Id.* at 541.  Plaintiffs sued, alleging that defendants violated "ERISA's duties of loyalty and prudence by poorly investing the assets of the plan."  *Id.*  The Supreme Court held that plaintiffs lacked standing to bring the suit, holding that a recipient of defined-benefit pension plans must allege a harm to their receipt of fixed benefits to establish standing ("[T]he plaintiffs lack Article III standing for a

14

simple, commonsense reason: They have received all of their vested pension benefits so far, and they are legally entitled to receive the same monthly payments for the rest of their lives. Winning or losing this suit would not change the plaintiffs' monthly pension benefits.") *Id.* at 547.

### A.    Plaintiffs fail to allege a substantial risk of future harm that confers standing.

Plaintiffs argue that there is a substantial risk that PICA and RGA will default, and, as a result, Plaintiffs will not receive their benefits. Pl. Opp'n. at 26-30. They also allege that state guarantees would be insufficient to satisfy their benefit expectations. *Id.* Defendants argue that Plaintiffs' allegations are too speculative and conclusory to support standing based on substantial risk of future harm. Verizon Br. at 15-23.

"An allegation of future injury may suffice" for standing purposes if a litigant can show "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The question here is whether Plaintiffs have sufficiently alleged a substantial risk that the Annuity Providers will fail to pay Plaintiffs' benefits.

The Amended Complaint contains numerous allegations about the alleged risk of the Annuity Providers based primarily on their use of captive reinsurance and ModCo. Because of these practices Plaintiffs allege that "PICA and RGA are high risk annuity providers that are likely to fail." AC ¶ 16. However, these allegations are conclusory and speculative. Prudential (including information about PICA) and RGA's Annual Reports are public record. These records show adequate assets and strong credit ratings for each of the Annuity Providers. *See* Prudential Financial, Inc., Annual Report (Form 10-K) (Feb. 17, 2025); Reinsurance Group of America, Inc., Annual Report (Form 10-K) (Feb. 21, 2025). Plaintiffs cannot and do not allege otherwise. The Annuity Providers are substantial companies. They will remain obligated to the beneficiaries

whether or not they enter into reinsurance and ModCo arrangements.  The fund of pension assets they received from Verizon cannot be divested.  Plaintiffs' allegations are not plausible.

Additionally, reinsurance and modified coinsurance are common industry practices. *Colonial Am. Life Ins. Co. v. C.I.R.*, 491 U.S. 244, 248 n.2 (1989) (stating that "modified coinsurance" is one of "the most common form[s] of indemnity reinsurance"); *Global Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 88 n.3 (2d Cir. 2021) ("Reinsurance is the insurance of one insurer (the 'reinsured') by another insurer (the 'reinsurer') by means of which the reinsured is indemnified for loss under insurance policies issued by the reinsured to the public.").  Absent specific allegations about the Annuity Providers' financials, the use of such common industry practices does not create a substantial risk default.  *Lee v. Verizon Comm'n, Inc.*, 837 F.3d 523, 546 (5th Cir. 2016) ("regardless of whether the plan is allegedly [harmed], the direct injury to a participants' benefits is dependent on the realization of several additional risks, which collectively render the injury too speculative to support standings.").  Stated differently, it is not plausible that there is a substantial risk of *imminent* failure by the Annuity Providers to pay Plaintiffs' benefits.  An allegation that the Annuity Providers may one day in the future fail to make their payments is insufficient to establish standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (a theory of standing that "relies on a highly attenuated chain of possibilities" is insufficient).

Therefore, Plaintiffs' allegations are overly speculative and conclusory to support standing based on a substantial risk of future harm.  I decline to find standing on this ground.

## B.    Seeking equitable remedies does not provide standing absent other injury.

Plaintiffs allege that their pleading of the equitable remedy for disgorgement of profits alone is sufficient to establish standing, even absent a present injury.  This is incorrect for two reasons.

First, Plaintiffs have not adequately alleged that Verizon profited from the Annuity Transaction such that its profits can be disgorged. Plaintiffs point to the fact that Verizon wrote off $5.9 billion in pension liabilities after transferring $5.7 billion in Plan assets to the Annuity Providers, which they claim created $200 million in profits for Verizon. AC ¶ 144. Plaintiffs are incorrect. The $200 million they point to is an accounting value difference, not actual cash or profits realized by Verizon. Therefore, they may not seek disgorgement as a remedy.

Second, as a matter of law, this theory of standing was foreclosed by *Thole*. In *Thole*, the Court rejected the plaintiffs' argument that they had "a general cause of action to sue for restoration of plan losses and other equitable relief" because they lacked a "concrete injury." *Thole*, 590 U.S. at 544. The same applies here. Seeking an equitable remedy is insufficient to create standing without a concrete injury.

## C. Plaintiffs fail to allege a diminution of present value that confers standing.

Plaintiffs additionally argue that they are presently injured by the Annuity Transaction based on a diminution of the present value of the Plans. This theory also fails.

*Thole* made clear that in defined-benefit plan cases a Plaintiff must allege harm to the receipt of benefits themselves, not to the overall value of the plan. *Thole*, 590 U.S. at 546. Plaintiffs' pension interests are inalienable and cannot be analogized to a lump sum payment or total value. 29 U.S.C. § 1056(d). Therefore, Plaintiffs have no ability to benefit from or be harmed by changes in the present value of the pension benefits. In other words, "[i]f [Plaintiffs] were to *lose* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less. If [Plaintiffs] were to *win* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny more." *Thole*, 590 U.S. at 541. Accordingly, this theory of standing also fails.

II.    **Plaintiffs fail to state a claim for breach of fiduciary duty against Verizon and State Street.**

Despite finding a lack of standing, I address Defendants' motions to dismiss for failure to state a claim and hold that Plaintiffs failed to state a claim.  Defendants challenge each of Plaintiffs' eight counts for failure to state a claim.  Counts I and II allege that Verizon and State Street breached their fiduciary duties in selecting PICA and RGA for the Annuity Transaction.  Count III alleges knowing breach of a fiduciary duty, in the alternative if Verizon or State Street are found to be non-fiduciaries.  The remaining counts allege prohibited transactions.

A.    **Verizon had fiduciary duties regarding the Annuity Transaction.**

As a preliminary matter, Verizon contends that it cannot be liable for breach of fiduciary duty because it properly delegated its fiduciary duties to State Street for the Annuity Transaction.  ERISA imposes fiduciary duties on those who act "in the capacity of manager, administrator, or financial adviser to a 'plan,'" but not those who act in the capacity of a sponsor.  *Pegram v. Herdrich*, 530 U.S. 211, 222 (2000).  "[A]n employer may, at different times, wear 'hats' as both a sponsor and administrator."  *Lee*, 837 F.3d at 535 (quoting *Pegram*, 530 U.S. at 225–26).  "[F]iduciary duties under ERISA are implicated only when it acts in the [administrator] capacity."  *Beck v. Pace Int'l Union*, 551 U.S. 96, 101 (2007).

Verizon argues that it did not act as a fiduciary because deciding whether to terminate a plan is a sponsor function that does not implicate fiduciary duties and that the decision as to how to terminate the Plans was properly delegated to State Street.  Verizon Br. at 28-30.  Verizon is correct that the initial decision to pursue a PRT was a settlor function.  *Beck*, 551 U.S. at 101.  However, Verizon consented to the selection of PICA and RGA—a decision subject to fiduciary duties.  Nothing in Verizon's agreement with State Street obligated Verizon to accept State Street's choice, and, at oral argument, Verizon could not represent that they did not have the option to veto

18

the selection.  Carlo-Gonzalez Decl., Ex. B; Oral Arg. Tr. at 26-27.  Thus, Verizon retained its fiduciary duties for the selection of the Annuity Providers.

Because both Verizon and State Street were subject to fiduciary duties for the Annuity Transaction, Plaintiffs' alternative theory of knowing participation of breach of fiduciary duty (Count III) shall be dismissed.

### B.    Plaintiffs fail to plausibly allege breach of fiduciary duty.

ERISA requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims."  29 U.S.C. § 1104(a)(1)(B).  Additionally, an ERISA fiduciary has a duty of loyalty such that he must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).

"[A] claim for breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint allege[s] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident."  *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718 (2d Cir. 2013)).  However, these factual allegations must be *reasonable*.  "ERISA calls for particular care … to ensure that the Amended Complaint alleges nonconclusory factual content raising a plausible inference of misconduct."  *Id.*  This is a "context specific" inquiry that "generally requires the plaintiff to allege facts that, if accepted as true, would show that a prudent fiduciary in like circumstances would have acted differently."  *Id.* at 727.

### 1.    Duty of Prudence

Plaintiffs allege that Defendants systematically ignored red flags in the Annuity Providers' investment strategies.  They allege that a reasonable fiduciary would not have selected those annuity providers, such that there must have been flaws in the selection process that violated the duty of prudence.  Pl. Br. at 39.  Plaintiffs further argue that Defendants had a duty to select the safest annuity provider available, based on Interpretive Bulletin 95-1, and that Defendants failure to do so was a breach of fiduciary duty.  *Id.* at 40.  Defendants argue that to state a claim for breach of the duty of prudence Plaintiffs must allege that the process employed by Defendants was improper.  Verizon Br. at 31.  Defendants contend that Plaintiffs' allegations focused on alleged issues with PICA and RGA, not on a deficient process of selection, which is insufficient to support their claim.  Further, Defendants argue that Interpretive Bulletin 95-1 has been interpreted by courts to provide factors in considering annuity providers, not that there can be only one safest provider that must be selected.  *Id.* at 33.  They contend that Plaintiffs failed to allege that a safer annuity provider was available.

As an initial matter, Interpretive Bulletin 95-1 does not require the fiduciary to select the safest possible annuity provider.  *Riley v. Murdock*, 1996 WL 209613, at *1 (4th Cir. 1996) ("no federal court has adopted [the safest available annuity] standard").  Rather, it provides a set of factors for the fiduciary to consider when selecting a safe annuity and explicitly notes that the factors may lend to multiple safe annuities or cost savings may advise towards one provider over another.  29 C.F.R. § 2509.95-1(c)-(d).  Therefore, Plaintiffs must plausibly allege that no reasonable fiduciary would have selected the Annuity Providers.  *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 429–30 (2014) (plaintiffs must "plausibly allege[] that a prudent fiduciary in the defendant's position could not have concluded" that the choice was appropriate).  Plaintiffs have failed to do so.

20

In the Amended Complaint, Plaintiffs raise innuendos about the alleged risk inherent in PICA and RGA's reinsurance strategies. However, these allegations do not give rise to a plausible inference of misconduct or lack of care by Defendants in selecting PICA and RGA. The Annuity Providers are reputable insurance companies, as discussed above. *See supra* Section I.A. Plaintiffs are unable to allege that the actual investments made by the Annuity Providers are suspect or point to other markers that would imply a high risk of default.

The allegations of risk from the reinsurance practices, in combination with the fact that the Plan assets would be held in a separate account, are not sufficient to plausibly allege that the Annuity Providers are at a high risk of default and that no prudent fiduciary would have selected them. Plaintiffs' allegations that Defendants ignored the alleged red flags are conclusory and insufficient to suggest a flawed process and breach of fiduciary duty. Therefore, Plaintiffs have failed to plausibly allege that "a prudent fiduciary in like circumstances would have acted differently" and the claim of breach of fiduciary duty shall be dismissed. *Morgan Stanley Inv. Mgmt.*, 712 F.3d at 727.

### 2.    Duty of Loyalty

Counts I and II allege that State Street and Verizon breached their duties of loyalty. Plaintiffs allege that State Street held a significant number of shares in Verizon, Prudential Financial Inc. (PICA's parent), and RGA which created a conflict of interest that gives rise to breach of duty of loyalty. Pl. Br. at 43. Additionally, Plaintiffs contend that Verizon's alleged profit from the transaction from writing off pension liabilities was a form of self-dealing that breached the duty of loyalty. In response, State Street argues that the financial relationship is "a common business relationship" that provides only "incidental benefits" that cannot support an inference of disloyalty. State Street Br. at 7. It notes that it holds stock in many companies on behalf of clients as an investment firm and that these investments do not create a conflict. Verizon

argues that the allegations that they considered the economic benefits of the deal does not support an allegation of breach of duty of loyalty as a matter of law.  Verizon Br. at 37-38.

I agree that Plaintiffs failed to allege breach of duty of loyalty for Verizon and State Street. "To state a claim for breach of loyalty, a plaintiff must allege facts that permit a plausible inference that the defendant engaged in transactions involving self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests."  *Bloom v. AllianceBernstein L.P.*, 725 F. Supp. 3d 325, 336 (S.D.N.Y. 2024).  "[T]he mere existence of a business relationship between two large financial institutions is not enough" to support a claim for breach of duty of loyalty.  *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *14 (S.D.N.Y. Oct. 7, 2019).  Additionally, "that a fiduciary's actions may have tangentially benefitted the fiduciary does not alone support an inference that the fiduciary acted disloyally."  *Doherty*, 2025 WL 2774406, at *13.

First, the allegations against State Street do not plausibly allege disloyalty.  As an investment firm, State Street holds stock in many companies tracking the major stock indexes on behalf of its clients.  These investments are only incidentally for State Street's benefit, as its clients receive the benefit of those investments.  This type of "common business relationship" does not support a plausible inference of liability absent other allegations to support disloyalty.  *Patterson*, 2019 WL 4934834, at *14.  Therefore, the claim for breach of duty of loyalty against State Street shall be dismissed.

Second, for Verizon, the Annuity Transaction did not involve a conflict where Verizon would unduly benefit.  Merely alleging that Defendants "were driven by their desire to drive revenues and profits" is insufficient to state a claim for breach of the duty of loyalty.  *Bloom*, 725 F.Supp.3d at 337.  Where other district courts have allowed similar claims, the allegations included

additional facts suggesting disloyalty or conflict, not mere investment or participation in the transaction. *See Doherty*, 2025 WL 2774406, at *13 (finding conflict of interest, in part, due to State Street's relationship with the private equity parties involved). As such, the claim for breach of duty of loyalty against Verizon shall be dismissed.

Therefore, for the aforementioned reasons, Plaintiffs have failed to state a claim for breach of fiduciary duty, and Counts I and II shall be dismissed.

### C.    Plaintiffs failed to allege prohibited transactions.

Plaintiffs allege that Defendants violated ERISA based on allegations of various forms of prohibited transactions under 29 U.S.C. § 1106(a) and 1106(b). ERISA bars certain transactions between the plan and a "party in interest." Transactions prohibited by Section 1106(a) include the "furnishing of goods, services or facilities between the plan and a party in interest," and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(C)–(D). As relevant here, ERISA defines a "party in interest" to include "a person providing services to such plan." 29 U.S.C. § 1002(14)(B).

### 1.    Counts VI & VII.

Plaintiffs allege prohibited transactions in Counts VI and VII against Verizon and State Street on the basis that PICA and RGA were parties in interest. The Supreme Court held in *NationsBank of N.C.*, that the sale of an annuity contract is not the provision of services, but rather the sale of a good—an investment product. *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 259 (1995). This holding is dispositive on this issue. Because PICA and RGA sold products and did not provide services, they are not parties in interest within the meaning of Section 1106(a). Therefore, this claim shall be dismissed.

Case 1:24-cv-10004-AKH    Document 97    Filed 01/08/26    Page 24 of 26

## 2. Count IV.

Count IV, against Verizon, alleges that State Street was a party in interest to the Annuity Transaction based on State Street's provision of services as an independent fiduciary. Pl. Opp'n. at 49. For a party to be a party in interest "some prior relationship must exist between the fiduciary and the service provider." *Ramos v. Banner Health*, 1 F.4th 769, 787 (10th Cir. 2021). Plaintiffs do not allege that State Street provided services to the Plans prior to its retention as an independent fiduciary. Absent such an allegation, Plaintiffs cannot rely on a circular argument that State Street was a party in interest in the transaction where it first provided services to the Plan. *Patrico v. Voya Fin., Inc.*, 2018 WL 1319028, at *7 (S.D.N.Y. Mar. 13, 2018) ("It is circular to suggest that an entity which becomes a party in interest by providing services to the Plan has engaged in a prohibited transaction simply because the Plan has paid for those services."). Therefore, this claim shall be dismissed.

## 3. Count V.

Count V, against State Street, alleges that Verizon is a party in interest to the transaction. Plaintiffs allege that Verizon's receipt of a balance sheet benefit from the Annuity Transaction was a transfer of assets to Verizon that made it a party in interest. Pl. Opp'n. at 49. To state a claim for a prohibited transaction there must be a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(C)–(D). The facts are contrary to what Plaintiffs attempt to claim here. Verizon did not actually receive or transfer any Plan assets to itself. Rather, Verizon transferred those assets to PICA and RGA and represented that change on its balance sheet. This is not a prohibited transaction under Section 1106(a), and this claim shall be dismissed.

4.      **Count VIII.**

Finally, Plaintiffs allege that Verizon improperly engaged in self-dealing in violation of Section 1106(b) because Verizon allegedly engaged in the Annuity Transaction to increase its profits. Pl. Opp'n. at 49. Section 1106(b) prohibits certain transactions between a "fiduciary" and a plan, dictating that a fiduciary with respect to a plan shall not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b). Section 1106(b) "codifies certain core tenets of the duty of loyalty by prohibiting a plan's fiduciary from engaging in transactions tainted by a conflict of interest and thus highly susceptible to self-dealing." *Bloom*, 725 F.Supp.3d at 344 (cleaned up).

These allegations are insufficient to assert a prohibited transaction. The Annuity Transaction did not unduly benefit Verizon. Merely alleging that Defendants "were driven by their desire to drive revenues and profits" is insufficient to state a claim for a prohibited transaction. *Bloom*, 725 F.Supp.3d at 337. Further, as noted previously, Verizon did not actually receive any profits from the Annuity Transaction. Under Plaintiffs' theory any PRT involving any annuity provider would be a prohibited transaction. This theory does not comport with the general permissibility of PRT transactions, absent breach of fiduciary duties. It is well established that "an employer's decision whether to terminate an ERISA plan is a settlor function immune from ERISA's fiduciary obligations" and that the termination of a plan through the purchase of annuities "formally severs the applicability of ERISA to plan assets and employer obligations." *Beck*, 551 U.S. at 106. Thus, Verizon's termination of the Plans through the Annuity Transaction cannot be a prohibited transaction under ERISA, and this claim shall be dismissed.

## CONCLUSION

For the aforementioned reasons, Defendants' motions are granted. Plaintiffs have not asked to replead and, it would seem, a repleading would be futile. The case is dismissed.

25

The Clerk of Court shall terminate ECF Nos. 63 and 69, grant judgment dismissing the

complaint on all counts, and close the case.


        SO ORDERED.

Dated:        January 8, 2026
              New York, New York

                                        ALVIN K. HELLERSTEIN
                                        United States District Judge